Don **MOTSENBOCKER**, James L. Sands, and Simco Leather Company, Inc., Appellants,

v.

William G. **POTTS**, Appellee.

No. 05-92-01883-CV.

Court of Appeals of Texas, Dallas.

Aug. 26, 1993.

Rehearing Denied Oct. 18, 1993.

David C. Myers, Earl S. Nesbitt, Dallas, for appellants.

Thomas H. Lee, J. Eric Toher, Houston, for appellee.

Before LAGARDE, OVARD and BARBER, JJ.

## OPINION

LAGARDE, Justice.

Don Motsenbocker[1] appeals the judgment of the trial court rendered on the jury's verdict holding him liable to William G. Potts for intentional infliction of emotional distress. Motsenbocker brings eleven points of error contending that (a) the trial court erred in submitting Potts's intentional infliction of emotional distress claim to the jury because the claim sounded in contract, not tort; (b) there is no evidence or insufficient evidence to support submission to or the findings of the jury of intentional infliction of emotional distress or to support exemplary damages; (c) the actual and exemplary damages awarded by the jury were excessive; and (d) the trial court erred in refusing to submit an instruction in the jury charge. We overrule the points and affirm the trial court's judgment.

## FACTUAL BACKGROUND

In July 1988, Potts owned and managed a saddlery and tack company called Potts Longhorn Leather Company when he was diagnosed with terminal cancer. The doctors told him he had only nine to eighteen months to live. Potts determined to survive long enough to settle his financial affairs to provide for the family he would eventually leave behind. When none of his family were interested in taking over management of the business, Potts decided to sell it.

Potts began negotiations with Tim Hassinger for the sale of Longhorn. After several contracts with Hassinger collapsed due to Hassinger's lack of financing, Hassinger told Potts he had found a bank that would provide financing if Hassinger and his partner, Joe Valandra, showed managerial ability. At that time, Potts needed to undergo a series of operations to install an infusion pump in his liver to help treat his cancer. Because he would be unable to manage the business himself due to the operations and recuperation periods, Potts agreed to turn over managerial control of Longhorn to Hassinger and Valandra.

In January 1989, Potts saw Motsenbocker at a saddlery trade show. Motsenbocker had heard about the pending sale of Longhorn and congratulated Potts. Motsenbocker told him that if anything went wrong with the sale, he would be interested in purchasing Longhorn.

Hassinger and Valandra did not prove to be competent managers: through a combination of incompetency and dishonesty, they ran Longhorn into dire financial straits. When the bank that provided Longhorn with revolving credit called the loan due, Longhorn could not pay it and filed for Chapter 11 bankruptcy protection. When Potts learned

---

1. James L. Sands and Simco Leather Co., Inc. settled with appellee before submission of this cause. We granted Sands's and Simco's motion to dismiss their appeal but denied severance.

that Hassinger and Valandra had given him "the run around" about being able to obtain financing, Potts fired them.

Potts began negotiations with Motsenbocker for the sale of Longhorn to Simco Leather Company, Inc., a saddlery company owned by Motsenbocker and James Sands and located in Chattanooga, Tennessee. The parties reached an agreement in principle providing that Simco would acquire the assets of Longhorn in exchange for paying Longhorn's loan to the bank and providing a five-year consulting contract to Potts at a salary of $75,000 per year plus health insurance. The bank agreed to the sale under these terms.

After reaching this agreement in principle, the bank and Potts learned that Hassinger and Valandra had failed to pay the payroll taxes. The bank then stopped the negotiations, put Longhorn into Chapter 7 bankruptcy, and posted the assets of Longhorn for foreclosure.

Motsenbocker remained interested in purchasing Longhorn in spite of these developments. Potts assisted Motsenbocker in formulating Simco's sealed bid for the foreclosure auction. At Potts's urging, Potts and Simco finalized a new agreement contingent on Simco having the highest bid at the foreclosure auction. Under this agreement, Potts would receive a five-year consulting contract at $60,000 per year ($5000 per month) plus the same health insurance as other employees of Simco. The consulting contract provided that Potts could be terminated only for violation of the contract's covenant not to compete or in the event of Potts's death or "permanent and complete incapacity." The sale agreement contained a stock-purchase provision under which Potts would receive $10,000 for the sale of his stock to a Simco subsidiary.[2] Simco submitted the highest bid at the foreclosure auction, thereby acquiring all of Longhorn's assets.

Potts's consulting contract began in October 1989. Motsenbocker told Potts that half of his monthly salary, $2500, would be paid by Longhorn in Denison, Texas, and the other half would be paid by Simco in Chattanooga. Beginning that first month, Potts received $2500 from Denison but did not receive the $2500 from Chattanooga. Motsenbocker told Potts that the Chattanooga office could not pay him because of serious cash-flow problems due to losses from the Longhorn operation in Denison. Motsenbocker orally proposed amending the consulting contract to provide that Potts would receive only $2500 per month except for months in which Longhorn made more than $5000 when Potts would be paid $5000. Under this arrangement, Potts received $5000 for only one month, June 1990.

Until October 1990, Potts had the same health insurance as all the other employees of Simco. The insurance had a deductible of about $300. When the policy came up for renewal, the carrier informed Simco it would charge a higher premium for the same coverage due to increased claims. Bob Petross, Simco's general manager, investigated Simco's claims history and found that Potts had the highest claims of all the employees.[3] Under the insurance plan that became effective in October 1990, Potts's deductible was raised from about $300 to $50,000. Neither Motsenbocker, Sands, Petross, nor anyone else at Simco told Potts that his deductible had been raised to $50,000. Potts did not learn of the change to his health insurance deductible until his doctors informed him that they could not get paid by the carrier. Potts called the carrier, which told him of the change in the deductible. The carrier said that Simco had requested the increase in Potts's deductible to $50,000. The carrier also told him that it had never written a policy like that before and that it had to reprogram its computer to do so. Potts had another health insurance policy, but because it was renewable quarterly and could be canceled by the carrier at any time, the policy did not afford Potts any peace of mind.

After learning of the change in his health insurance, Potts tried without success to telephone Motsenbocker to complain about this latest breach of the consulting contract. On

2. Potts was never paid the $10,000 for the stock, nor was the stock ever transferred to Simco.

3. Besides his cancer treatments, Potts had suffered heart trouble and had undergone surgery to install a pacemaker.

December 7, 1990, Potts sent Motsenbocker a letter complaining of the reduction in his salary and the change in his health insurance. Potts said in the letter that if Motsenbocker did not contact him within ten days, he would seek legal advice. Motsenbocker did not contact him. Potts received his last check from Simco on January 11, 1991.

On January 17, 1991, Potts's attorney wrote to Motsenbocker, Sands, and Simco threatening legal action if he were not contacted within ten days. Motsenbocker spoke with Potts on February 15, 1991. Potts testified that Motsenbocker told him that he would have Simco send a certified letter to Potts demanding his presence in Chattanooga for consultation. Motsenbocker told Potts that he knew Potts would not go to Chattanooga because of his cancer treatments, and that he would fire Potts when he did not show up in Chattanooga. Potts received a letter dated February 18, 1991 from Petross notifying him that he was to begin immediately to perform his consulting duties in Chattanooga. When Potts did not arrive in Chattanooga, he received a letter dated March 20, 1991 from Petross informing him that he had breached the consulting contract and that his relationship with Simco was terminated.

Potts sued Motsenbocker, Sands, and Simco for, among other claims, breach of contract, fraud, and intentional infliction of emotional distress. The jury found that Simco had breached the consulting agreement and awarded damages of $258,941.92 and attorney's fees of one-third that amount. The jury found that the defendants had not committed fraud but did find that they had maliciously committed intentional infliction of emotional distress. The jury awarded actual damages of $25,000 against Simco and $50,-000 each against Motsenbocker and Sands and exemplary damages of $50,000 against Simco and $185,000 each against Motsenbocker and Sands. The judgment did not provide for joint and several liability. Because Sands and Simco have settled, our discussion of the points of error relates only to Motsenbocker. On appeal, Motsenbocker challenges only issues relating to Potts's claim of intentional infliction of emotional distress.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ In *Twyman v. Twyman*, the Texas Supreme Court formally announced its recognition of the tort of intentional infliction of emotional distress. *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex.1993) (plurality opinion); *see id.*, at 626 (Phillips, C.J., concurring and dissenting); *id.*, at 644 (Spector, J., dissenting); *see also Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (1993) (acknowledging recognition of intentional infliction of emotional distress). The court adopted the elements of the tort as stated in Restatement (Second) of Torts, section 46:

(1) the defendant acted intentionally or recklessly,

(2) the conduct was extreme and outrageous,

(3) the actions of the defendant caused the plaintiff emotional distress, and

(4) the emotional distress suffered by the plaintiff was severe.

*Wornick*, 856 S.W.2d at 734; *Twyman*, 855 S.W.2d at 621; *see* RESTATEMENT (SECOND) OF TORTS § 46 (1965).[4]

■ The element that conduct be extreme and outrageous "should be found 'only where the conduct has been so outrageous in

4. The Restatement phrases the test thus:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46 (1965). *Twyman* does not mention paragraph (2) of section 46. We do not determine in this case whether paragraph (2) is a recognized tort in Texas. To the extent that the Restatement conflicts with the phrasing of the elements of the tort in *Twyman*, we apply *Twyman*.

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman*, 855 S.W.2d at 621 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)[5]); *see Wornick*, 856 S.W.2d at 734. The extreme and outrageous nature of the conduct "may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Cmt. f. Outrageous conduct is privileged where the actor "has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Cmt. g. Whether conduct is outrageous is initially a question of law for the court. "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Cmt. h; *see Wornick*, 856 S.W.2d at 734; *Twyman*, 855 S.W.2d at 625 n. 21.

 The emotional distress the plaintiff suffers must be severe. To be recoverable under this tort, the distress inflicted must be "so severe that no reasonable man could be expected to endure it." Cmt. j. The distress suffered must be reasonable under the circumstances. The defendant is not liable for distress suffered by the plaintiff that was exaggerated by a peculiar susceptibility of the plaintiff unless the defendant had knowledge of it. *Id.* Whether severe emotional distress can be found in the evidence is a question of law for the trial court. "[I]t is for the jury to determine whether, on the evidence, it has in fact existed."
*Id.*

 The severe emotional distress must be inflicted either intentionally or recklessly. "An actor is reckless when he 'knows or has reason to know ... of facts which create a high degree of risk of ... harm to another, and deliberately proceeds to act, or fails to act, in conscious disregard of, or

indifference to that risk.'" *Twyman*, 855 S.W.2d at 624 (quoting RESTATEMENT (SECOND) OF TORTS § 500 cmt. a (1965)) (omissions by supreme court). The jury is free to disregard the defendant's assertion that no harm was intended and to draw inferences necessary to establish the defendant's intent. *Id.*

## SUFFICIENCY OF THE EVIDENCE

In his fifth through ninth points of error, Motsenbocker challenges the legal and factual sufficiency of Potts's evidence that Motsenbocker committed all the elements of intentional infliction of emotional distress.

 In addressing a legal sufficiency or no-evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, that support the jury's finding, and we must disregard all evidence and inferences to the contrary. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987); *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails. *Stafford*, 726 S.W.2d at 16. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex.1970). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence. *Kindred*, 650 S.W.2d at 63.

 In addressing a factual-sufficiency-of-the-evidence challenge upon a jury verdict, an appellate court must consider and weigh *all* of the evidence, not just that evidence which supports the verdict. *City of Princeton v. Abbott*, 792 S.W.2d 161, 163 (Tex.App.—Dallas 1990, writ denied); *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). The verdict should be set aside only if it is so contrary to the overwhelming weight of the

**5.** Except where otherwise noted, all cites to a "cmt." are to comments under RESTATEMENT (SEC-OND) OF TORTS § 46 (1965).

evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176; *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

### Outrageousness of Motsenbocker's Conduct

■ In his third point of error, Motsenbocker contends that the acts for which the jury found intentional infliction of emotional distress do not constitute extreme and outrageous conduct as a matter of law. As we noted above, the Restatement provides that if the trial court determines that reasonable minds could differ on whether the actor's conduct is sufficiently extreme and outrageous "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," then the issue must be submitted to the trier of fact. *See* cmt. d.

Question eight of the jury charge asked:

Do you find from a preponderance of the evidence that any one or more of the listed parties intentionally inflicted emotional distress upon William G. Potts *through the modification of the health insurance policy, termination of employment, and/or nonpayment of the $5000.00 per month?*

(Emphasis added.) The jury answered "yes" as to Motsenbocker. If reasonable minds could differ on whether the acts in question eight were so extreme and outrageous as to go beyond all possible bounds of decency and were atrocious and utterly intolerable in a civilized community, then the trial court did not err in submitting the question.

Motsenbocker argues that the termination of employment, the nonpayment of the $5000

per month, and the modification of the health insurance, as a matter of law, cannot constitute extreme, outrageous conduct because they were mere breaches of contract. He also asserts that a breach of contract does not give rise to a cause of action for intentional infliction of emotional distress unless the breach was accompanied by some extreme or outrageous act. *See Taylor v. Houston Lighting & Power Co.,* 756 F.Supp. 297, 301 (S.D.Tex.1990); *see also Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381 (10th Cir.1988).

Because we conclude that the modification of the health insurance, under these facts, can constitute extreme and outrageous conduct, we need not consider whether the termination of the employment and the nonpayment of the $5000 per month could constitute extreme and outrageous conduct. Considering only the evidence supporting the finding that the raising of the deductible to $50,000 was extreme and outrageous, the record shows that Motsenbocker knew that Potts had terminal cancer and had the highest medical bills of all Simco's employees. Petross testified that Motsenbocker instructed him to raise the deductible on Potts's health insurance to $50,000 from $300. Finally, Motsenbocker did not tell Potts that he had raised the deductible to more than 166 times its original level but let him continue to accumulate medical bills and learn of it only when his doctors complained of claims not being paid by the insurance carrier. Petross testified that the change in Potts's deductible saved Simco only about $10 per employee per month, a total savings of only $18,000 over the whole year for 150 employees.

We hold that reasonable jurors could differ on whether this conduct is so extreme and outrageous as to go beyond all possible bounds of decency and was atrocious and utterly intolerable in a civilized community.[6] Thus, the trial court did not err in submitting question eight to the jury. Accordingly, we overrule the third point of error. We also

---

**6.** The Restatement notes that conduct that fits this description is such that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Cmt. d. Motsenbocker's direction to Petross to raise

Potts's deductible, when Motsenbocker knew that Potts was suffering from terminal cancer and had high medical expenses, and the failure even to notify Potts of the drastic change to his deductible meets this test.

hold that this evidence constitutes some evidence to support the jury's finding that Motsenbocker's conduct was extreme and outrageous.

Motsenbocker also contends that there is insufficient evidence to support the jury's finding of outrageous conduct. Motsenbocker denied directing Petross to raise Potts's insurance deductible to $50,000. He testified that Sands contacted him in August 1990 about a problem getting the health insurance renewed. Sands told him that part of the problem was the high cost of Potts's insurance. Motsenbocker told Sands that "the only idea I got is that you can check to see if there's some kind of deductible we could get on this policy that would keep the overall cost of the insurance lower." Motsenbocker testified that he never told Sands or Petross to raise Potts's deductible to $50,000. He stated that he learned of the increase in Potts's deductible when Potts told him in November that the insurance was not paying his doctors. Motsenbocker stated that this news surprised him. The jury was free to reject Motsenbocker's testimony and accept Petross's and Potts's versions of the event as true. We hold that the evidence is sufficient to support the jury's finding that Motsenbocker's conduct was extreme and outrageous.

### Severity of Emotional Distress

In his fourth point of error, Motsenbocker contends that Potts's emotional distress was not, as a matter of law, severe enough to support a claim for intentional infliction of emotional distress. Motsenbocker also challenges the legal and factual sufficiency of the jury's finding that Potts suffered severe emotional distress. Both Potts and his wife, Patsy, testified to the severity of the emotional distress he suffered from having the deductible on his health insurance raised to $50,000.

Potts testified that he considered the increase in his health insurance deductible to have been, in effect, the cancellation of his insurance. When asked about the impact on him of discovering that the deductible on his health insurance had been raised, Potts stated:

It was very disturbing. They knew how important that was to me, and I certainly knew how important it was, and, as you know, you have seen horror stories all the time about a bad last illness wiping out all your assets for your family, leaving them destitute. I could just kind of see that perhaps happening to me.

Potts also testified about the physical impact of the raising of his deductible:

I would be up at night anyway, paddling around the house because the tumors were hurting and maybe I would have nausea. Now, this wasn't every night, but when you do that, you get to thinking of all the bad things you can think that could happen, and this was certainly one of them that I would be—leave my wife destitute or could leave my wife destitute and had no other place to turn.

You get where you just—your mind kind of runs rampant, maybe, and it maybe doesn't make any sense, but you can't help but think about it. And I could just see myself, you know, l[y]ing up there in the indigent ward at Parkland Hospital staring out the window and Patsy with no support. I mean she did a whale of a job on raising children, but what kind of job market is there now for someone like her?

Potts testified that this insomnia occurred about two or three times per week beginning when he learned of the modification of his health insurance policy.

Potts's wife testified that when Potts learned from the carrier about the change in his deductible,

it scared him. He had cancer and he realized that he could not get new health insurance. Nobody with cancer is able to. He was not old enough to have Medicare.

\* \* \* \* \* \*

He worried that—he could imagine that a lengthy illness with cancer could wipe out our savings, and he would be obliged to use the—be obliged to use the charity ward at the county hospital, that I would be without income and he felt frightened by this prospect, and it was a very real prospect at the time.

\* \* \* \* \* \*

He told me one time in a very personal moment that he had begun to wonder if he had the right to continue fighting his cancer so hard in order to gain a few years of life if, in the process of doing that, he would impoverish his family.

Motsenbocker argues that this testimony, as a matter of law, fails to establish severe emotional distress because it shows only that Potts was "very disturbed," "uncomfortable," "worried," "ill at ease," "frightened," and under "stress," which he contends does not rise to a sufficiently severe level. We disagree. The Pottses' testimony shows that the distress he suffered was more than "trivial emotional distress[, which] is a part of the price of living among people." Cmt. j. Mrs. Potts's testimony raises the inference that Potts was seriously contemplating suicide, or at least giving up the fight against the disease, as a result of effectively losing his health insurance coverage.

This testimony of the Pottses about the emotional distress Potts suffered upon learning of the change to his health insurance deductible was sufficient to permit the trial court to determine on the evidence that severe emotional distress could be found. *See* cmt. j. Accordingly, we overrule Motsenbocker's fourth point of error. This testimony also constitutes more than a scintilla of evidence that the distress inflicted was so severe that no reasonable person could be expected to endure it. *See id.* Accordingly, we hold that there is some evidence of severe emotional distress.

Motsenbocker argues that the evidence is insufficient to support the jury's finding of severe emotional distress because Potts had a separate health insurance policy he acquired after learning he had cancer. However, both Potts and his wife testified that this policy gave him no peace of mind because it was renewable quarterly and subject to cancellation at any time. Although the policy was never cancelled, Potts lived in fear that it would be.

Motsenbocker also argues that the evidence is insufficient to show that Potts suffered severe emotional distress as a result of the modification of his health insurance policy because Potts was already suffering emotional distress as a result of having cancer and having seen Hassinger and Valandra ruin his business. While these events were extremely stressful, they do not prevent Potts from suffering severe emotional distress as a result of the modification of the health insurance policy. Even if Potts's reaction to the change in his deductible was exaggerated as a result of those events, Motsenbocker is not relieved of liability because he knew of them. *See* cmt. j. We hold that the evidence is sufficient to support the jury's finding that Potts suffered severe emotional distress from the modification of his health insurance.

### Intent

Motsenbocker also contends that the evidence is legally and factually insufficient to support the jury's finding that he intentionally or recklessly inflicted emotional distress on Potts. The jury charge defined "intentionally" as follows: "One acts 'intentionally' if he desires to inflict severe emotional distress, or where he knows that such distress is substantially certain to follow from his conduct." The charge did not define "recklessly." In *Twyman*, the supreme court stated that "[a]n actor is reckless when he 'knows or has reason to know ... of facts which create a high degree of risk of ... harm to another, and deliberately proceeds to act, or fails to act, in conscious disregard of, or indifference to that risk.'" *Twyman*, 855 S.W.2d at 624 (quoting RESTATEMENT (SECOND) OF TORTS § 500 cmt. a (1965)) (omissions by supreme court).

Motsenbocker argues that no evidence shows that he intended to cause Potts emotional distress by raising his health insurance deductible. Motsenbocker asserts that the record shows that raising Potts's deductible from $300 to $50,000 was a legitimate business decision to have Simco's premiums reduced. Petross testified that the change in Potts's deductible only saved Simco ten dollars per employee per month, a total savings of $18,000 per year. The jury was entitled to reject the idea that savings to the company of $18,000 at the expense of $49,700 to one employee on a salary of $30,000 to $60,000 was the reason for the decision.

Motsenbocker also contends that the record demonstrates his lack of intent by the uncontroverted evidence that he knew that Potts had another health insurance policy. Thus, argues Motsenbocker, he knew Potts would not be damaged by raising his health insurance deductible.[7] Motsenbocker testified, however, that he did not know the terms of Potts's other insurance policy. This evidence, Motsenbocker argues, along with evidence of his lack of intent to injure Potts, makes the evidence of intent insufficient to support the jury's verdict.

The jury was free to disregard Motsenbocker's protestations that no harm was intended and to draw inferences necessary to establish his intent. *See Twyman,* 855 S.W.2d at 623. The jury could infer that Motsenbocker knew that health insurance premiums were subject to renewal and changed rates on renewal. Indeed, the change in Potts's deductible was supposedly due to the increased premiums caused by Potts's claims. Thus, the jury could infer that Motsenbocker knew or had reason to know Potts's separate policy was subject to cancellation or an increase in premium so that Potts would no longer be able to afford it, thereby providing Potts little protection. The jury could also infer from Potts's insistence throughout the negotiations that he be provided health insurance by Simco that Motsenbocker knew or had reason to know that the health insurance included in Potts's consulting contract was vitally important to him. From this evidence, the jury could conclude that Motsenbocker knew or had reason to know that raising Potts's deductible from $300 to $50,000 created a high degree of risk of causing severe emotional distress to Potts and that Motsenbocker was indifferent to that risk when he instructed Petross to raise the deductible. Accordingly, the record contains some evidence and sufficient evidence to support the jury's finding that Motsenbocker acted recklessly.

### Causation

■ Motsenbocker also argues that there is no evidence or the evidence is insufficient to support the jury's finding that his actions caused Potts's emotional distress. Potts's and his wife's testimony about the severity of his emotional distress also shows that the distress was caused by the increase in his deductible. If the deductible had not been raised, then Potts would not have had to worry about the expenses of his cancer treatment possibly leaving his wife destitute. Nor would he have had to consider whether he had the right to try to survive if his survival was going to impoverish his family. We hold that this evidence is some evidence, and sufficient evidence, of causation. We overrule Motsenbocker's fifth and sixth points of error.

### Actual Damages

■ In his seventh point of error, Motsenbocker contends that there is insufficient evidence of the degree of mental anguish necessary to support the jury's award of $50,000 for mental anguish. In defining "mental anguish," the jury charge states:

"Mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair or public humiliation.

The record shows that the raising of the deductible caused Potts severe disappointment and despair.

Motsenbocker argues that the $50,000 damage award for mental anguish is excessive when compared to other cases involving mental anguish which, according to Motsenbocker, was significantly more severe than Potts's. Motsenbocker cites *Tidelands Automotive Club v. Walters,* 699 S.W.2d 939 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.), where the plaintiff was awarded only $10,000 damages for mental anguish on facts that Motsenbocker argues show more severe emotional distress than that suffered by Potts. *Tidelands* states, however, that there is no certain standard to measure mental anguish damages because they cannot be

7. In fact, Potts was not monetarily damaged by the raising of his deductible.

proven with certainty and accuracy. Therefore, the question of damages, if not excessive, is properly left for the jury to determine. *Tidelands*, 699 S.W.2d at 945. Much discretion must be allowed in fixing the amount. We do not reverse an award of damages unless the evidence is so weak or the evidence to the contrary is so overwhelming that the award is manifestly wrong and unjust. *City of Dallas v. Arnett*, 762 S.W.2d 942, 957 (Tex.App.—Dallas 1988, no writ). Considering the evidence of Motsenbocker's raising Potts's deductible to $50,000 and its effect on Potts, we do not find the award of damages manifestly wrong and unjust.

Motsenbocker also contends that the award of actual damages should be reversed because it was not based on the evidence but is the result of passion, prejudice, corruption, sympathy, or an improper motive. Instead of basing the award on the extent of mental anguish suffered by Potts due to Motsenbocker's conduct, Motsenbocker asserts that the jury based its award on Potts's cancer, the deterioration and subsequent bankruptcy of his business, and the sale of his home where he and his wife had lived for thirty years. Motsenbocker also contends that the award was based on Potts's wife's testimony that her father had been a justice on the Amarillo Court of Appeals. Motsenbocker provides no argument on why the jury's award necessarily shows that it was based on these grounds. As we noted above, the jury's award is supported by sufficient evidence. We overrule Motsenbocker's seventh point of error.

### Malice

■ In his eighth and ninth points of error, Motsenbocker contends that there is no evidence or the evidence is insufficient to support the jury's finding that Motsenbocker performed the acts constituting intentional infliction of emotional distress with malice. The jury charge defined "malice" as "conduct that is motivated or accompanied by ill will, evil motive or such reckless indifference to the rights of others as to amount to a willful act done without just cause or excuse." Motsenbocker argues that his conduct could not have been motivated by ill will, evil motive,

or amount to reckless indifference to Potts's rights because the raising of Potts's deductible from $300 to $50,000 was motivated by a legitimate business motive—lessening the company's costs of its employees' health insurance program. As we noted earlier, the jury was free to reject this argument. The jury had Petross's testimony that Motsenbocker instructed him to raise Potts's health insurance deductible to $50,000. The jury could have believed, based on the evidence, that savings to Simco's employee benefits program of $18,000 per year at an expense to Potts, who was only one out of 150 employees, of $49,700 per year was not a legitimate business decision. The jury could also consider the fact that Motsenbocker knew that Potts had high medical expenses and knew of the importance to Potts of the health insurance provided by Simco. These facts, together with the fact that no one even informed Potts of the change to allow him an opportunity to arrange different health insurance but allowed him to learn of the change through his physicians' complaints of not being paid, constitute sufficient evidence supporting the jury's finding that Motsenbocker acted with malice. Accordingly, we overrule Motsenbocker's eighth and ninth points of error.

### Excessive Exemplary Damages

■ In his tenth point of error, Motsenbocker contends that the jury's award of $185,000 in exemplary damages against him was excessive in light of the evidence presented at trial. Motsenbocker argues that his conduct did not warrant the imposition of exemplary damages and that an award of exemplary damages in this case does not further the policies underlying exemplary damages.

■ Exemplary damages must be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). However, there is no fixed formula for determining the reasonableness of exemplary damages in relation to actual damages. Each case must be judged on its own facts. *Id.; Elbar, Inc. v. Claussen*, 774 S.W.2d 45, 53 (Tex.App.—Dallas 1989, writ

dism'd). Factors considered in judging the reasonableness of the award include:

(1) the nature of the wrong;

(2) the character of the defendant's conduct;

(3) the degree of the defendant's culpability;

(4) the situation and sensibility of the parties; and

(5) the extent to which the conduct offends the public's sense of justice and propriety.

*Alamo Nat'l Bank,* 616 S.W.2d at 910; *Elbar, Inc.,* 774 S.W.2d at 53.

The ratio of exemplary damages to actual damages in this case is 3.7:1. In *Elbar, Inc.,* a wrongful death case, this Court affirmed an award of exemplary damages of 3.75:1. *See Elbar, Inc.,* 774 S.W.2d at 54. One court of appeals affirmed a ratio of 2250:1 in a case of invasion of privacy by telephone harassment. *Donnell v. Lara,* 703 S.W.2d 257, 261–62 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). In this case, each of the five factors supports the jury's award of exemplary damages. We hold that the award of $185,000 in exemplary damages against Motsenbocker is not excessive. We overrule Motsenbocker's tenth point of error.

## CONTRACT VERSUS TORT

■ In his first and second points of error, Motsenbocker contends that the trial court erred in submitting questions eight through eleven [8] to the jury and in rendering judgment on the verdict because Potts's cause of action sounded only in contract, not in tort. Motsenbocker also contends that there were no duties imposed on him that would give rise to tort liability other than those imposed by the contract.

The principles of contract and tort causes of action are well settled. However, it is often difficult in practice to determine whether a plaintiff's cause of action sounds in contract or tort. To determine whether the claim is one for contract or tort, we look to the substance of the cause of action and not the way the plaintiff pleads it. *International Printing Pressman & Assistants' Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 735 (1946).

The parties' contractual relationship may create duties under both contract and tort law. *See Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 510 (1947). A party's action may breach duties in contract or tort alone or simultaneously in both. The nature of the injury usually determines which duty or duties are breached. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986); *see Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494–95 (Tex.1991). When the injury is only the economic loss to the subject of a contract itself, the action sounds only in contract. *See Mid–Continent Aircraft Corp. v. Curry County Spraying Serv.,* 572 S.W.2d 308, 312 (Tex. 1978); *Central Sav. & Loan Ass'n v. Stemmons N.W. Bank, N.A.,* 848 S.W.2d 232, 238 (Tex.App.—Dallas, n.w.h.).

Here, Potts claimed more than the mere economic loss as damages due to the modification of his health insurance; he claimed and presented evidence of severe emotional distress caused by Motsenbocker's extreme and outrageous conduct. Because Potts's mental anguish caused by Motsenbocker's intentional infliction of emotional distress was an injury of a completely different nature than his claim for economic damages caused by the breach of the consulting contract, Potts's claim sounded in tort. In his claim for intentional infliction of emotional distress, Potts asserted that Motsenbocker breached the duty not to intentionally inflict emotional distress on him. This duty arises under the common law, not under the party's contract. We hold that the trial court did not err in submitting questions eight through eleven or in rendering judgment on the verdict. We overrule Motsenbocker's first and second points of error.

## JURY INSTRUCTION

■ In his eleventh point of error, Motsenbocker contends that the trial court erred

---

8. Question 8 asked whether Motsenbocker had committed intentional infliction of emotional distress; question 9 asked the jury to determine the amount of Potts's actual damages; question 10 asked whether Motsenbocker acted with malice; and question 11 asked the jury to determine the amount of exemplary damages.

in not submitting a jury instruction. To preserve any error by the trial court in refusing to submit a jury instruction, the complaining party must have presented the instruction *in writing* in substantially correct form to the trial court. TEX.R.CIV.P. 278; *Texas Gen. Indem. Co. v. Moreno,* 638 S.W.2d 908, 914 (Tex.App.—Houston [1st Dist.] 1982, no writ). Motsenbocker did not submit the instruction in writing to the trial court. Accordingly, he waived any error in the trial court's failure to submit the instruction to the jury. We overrule Motsenbocker's eleventh point of error.

We affirm the trial court's judgment.