**Barbara McLURE, Appellant,**

v.

**Billie H. TILLER, Appellee.**

No. 08–00–00182–CV.

Court of Appeals of Texas, El Paso.

Oct. 25, 2001.

Rehearing Overruled Jan. 2, 2002.

Michael C. Crowley, Edward Dunbar, Dunbar, Armendariz, Crowley & Hegeman, L.L.P., El Paso, for Appellant.

Roy E. Kohn, III, Ken Slavin, Kemp Smith, P.C., El Paso, for Appellee.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

SUSAN LARSEN, Justice.

In this intentional infliction of emotional distress case, Barbara McLure appeals from the trial court's judgment n.o.v. We reverse the trial court's judgment n.o.v., order entry of judgment in accordance with the jury's verdict on noneconomic damages, and reform the jury's award of exemplary damages to $500,000.

### Facts

In August 1997, Billie Tiller contracted with McLure Precast Corporation to build 135 storage units in El Paso, Texas. McLure Precast was wholly owned and operated by Bill and Barbara McLure, husband and wife.

In December 1997, during construction, Bill McLure was diagnosed with a malignant brain tumor. The McLures shared this health information with Tiller. Almost immediately after being diagnosed, Bill began radiation treatment and had a shunt implanted to drain fluid from his brain. Although Bill continued to actively work on Tiller's project through December, the corporation also hired Doug Hansen, an experienced construction supervisor, to act as on-site supervisor.

On February 16, 1998, Barbara McLure sent a letter to Tiller, informing him that Bill's condition had worsened, that the corporation would nevertheless complete Tiller's project, that Hansen would continue as on-site project superintendent, and that J.V. McLure, Bill's son (who owned his own construction company in Dallas) was available to address any concerns that Tiller might have. She also asked Tiller to refrain from asking Hansen to make any changes in the work, to perform any extra work, or to change the work schedule. McLure asked Tiller to refrain from giving orders or directions to the workmen on the site. Also on February 16, J.V. McLure sent Tiller a cordial letter on his business letterhead, offering to provide his services to McLure Precast to insure completion of the project, including engineering, technical and management assistance, and even offering to have his corporation, Metal-Man, Inc., act as surety. He concluded by stating, "[b]y working together, we can complete your project quickly, maintain the budget and keep your property free from liens."

After learning that Bill McLure was ill, Tiller began making unnecessary telephone calls to the McLure's home, asking for things that he already had, and complaining about aspects of the project. His tone during these calls was rude and demanding, even though he knew he was calling the family home during a time of great anxiety. Among other things, his complaints were that the project was behind schedule, that he was suffering lost rents although he had no certificate of occupancy, and that he needed duplicates of invoices which Barbara knew she had sent him. Whenever Tiller called, he was rude and curt. These calls left Barbara McLure nervous and upset. Tiller's calls continued through the holidays into January and February of 1998. About a week before Bill McLure died, Tiller called the McLure home on a Sunday morning, demanding to speak to Barbara and making numerous complaints. When Barbara returned home from the hospital that morning, learned from her daughter that Tiller had called again, and saw his list of concerns, she broke down, shaking and crying. Barbara refused her family's request to get a restraining order against Tiller because she was afraid he would use that as evidence that McLure Precast was not doing its job. Despite his myriad verbal grievances about the job, Tiller never put a single complaint about the project in writing.

On February 24, J.V. McLure again wrote to Tiller. In relevant part, this letter read:

> Every day I hear reports of you complaining to many people about your project and the services McLure Precast Corporation is providing you with. We are very concerned with the project and McLure's reputation. If you have any *legitimate* complaints, we want to identify them and act upon them.
>
> We ask that you review your contract with McLure Precast Corporation. That agreement sets forth notice requirements and all other terms and conditions that govern the project. Phone calls to Barbara McLure and her children on Sunday morning voicing complaints is not per the contract and in view of my Dad's condition, I find it to be disgusting.
>
> Also, please review the time of completion requirements as stated in the agreement. We find it very difficult to understand your complaints concerning time and performance when the project is on schedule. Your complaint that you are suffering from lost rent is absurd. No units may be rented until the entire project is complete and the City of El Paso has issued a certificate of occupancy.
>
> . . .
>
> If you have any questions, comments or concerns, please feel free to contact me. Call collect if you like. If you have *legitimate* complaints, please make them in writing and in accordance with the contract. I am thanking you in advance for refraining from any more nasty phone calls or outbursts with members of my family at a most difficult time. (Emphasis in original).

Bill McLure died on February 26, 1998. Tiller threatened to terminate the contract if McLure Precast closed for the day so that its employees could attend Bill's funeral.

After Bill McLure's death, Tiller continued his calling campaign to the McLure home until the project was complete. Among other things, he threatened to charge McLure Precast for repairs to his Caterpillar track loader. He threatened to take over management of the project and terminate the contract because Bill McLure had died. He ordered certain materials from Jobe Concrete and Sun City Construction, charged them to McLure's account, and then failed to pay the almost $30,000 owed.

McLure Precast finished the storage unit construction on schedule, and in a competent, workmanlike way. Once McLure Precast's work under the contract was done, Tiller's aggressive phone calls ceased and indeed he avoided Barbara McLure, refusing to meet with her to discuss $36,957 he owed on the contract. He refused to make an invoiced payment for management services because Bill McLure had died. Tiller admitted this refusal at trial, even though his contract was with a corporation which had hired an on-site supervisor and whose surviving corporate principal was devoting all her resources to his project. It is uncontroverted that when she met with him to discuss payment in June, Tiller told McLure, "Honey, there's no more money." He told her this even though his credit line for construction projects with Bank of the West had been increased to $400,000 in April 1998.

J.V. McLure sent Tiller a final letter in June 1998. After expressing disappointment that Tiller would not see Barbara McLure to discuss settling the amounts owed under the contract, he wrote:

> Not long ago, I cautioned you that not paying your bill might cause you to end

up in a courtroom with Mrs. McLure. Your response was for me to let her know, 'She was not going to be in court with a virgin.'

In 1999, an earthmoving contractor named Kyle McCardle visited Tiller to discuss business. During their conversation, McCardle asked if Mrs. McLure had filed a lawsuit against him. McCardle testified that Tiller "kind of reared back in his chair and he said, 'well, she wouldn't dare do that.' He said that if she tried—if she tried to sue him that he would drag her ass back and forth from Dallas to court so many times it would break her financially." McCardle testified that upon hearing this "I was stunned because I know—I mean, she's a widow. She finished the job, and I knew he had rented out all the spaces. It was a good job."

Because of Tiller's failure to pay the amounts owed under the contract, McLure could not pay her employees and subcontractors. She used her credit card to make payroll. Because Tiller had not paid the money he owed McLure Precast, the corporation had no capital with which to work on future projects. According to family members, the corporation's failure caused Barbara severe distress. She was forced to sell personal property and McLure Precast's assets to meet payroll. Ultimately, Barbara McLure had to liquidate the business, sell her house, and move in with her son.

Barbara McLure's daughter, Deborah Williams, testified that Barbara's stress caused by Tiller's conduct was separate and apart from the stress caused by Bill's medical condition and death. Barbara did not have time to grieve the loss of her husband because she was too busy working on the project. At the time of trial, Barbara was still affected by Tiller's conduct in that her personality had changed and she was still having trouble making decisions or concentrating on the task at hand. Williams stated that Barbara McLure now lacked the motivation and drive to work hard that she used to possess. She testified that Tiller's conduct caused her mother to suffer severe emotional distress.

Barbara filed suit against Tiller for intentional infliction of emotional distress.[1] A jury answered affirmatively that Tiller had intentionally inflicted emotional distress upon McLure, and awarded her $250,000 in past mental anguish, $250,000 in future mental anguish. It also found by clear and convincing evidence that Tiller had acted with malice, and awarded $1,500,000 as exemplary damages. Tiller filed his motion for judgment n.o.v., arguing that McLure had failed to prove, as a matter of law, that Tiller acted intentionally or recklessly; and that Tiller's conduct was extreme and outrageous. The trial court granted Tiller's motion and entered a take-nothing judgment.

## Standards of Review

### Judgment n.o.v.

A trial court may grant a judgment n.o.v. if a directed verdict would have been proper.[2] The trial court can properly grant a directed verdict or judgment n.o.v. only if there is no evidence to support the jury's findings.[3] To review the decision of the trial court, we consider only the evidence and reasonable inferences that support the jury's answers, and we disregard

---

1. It appears that McLure Precast also sued Tiller for breach of contract in separate litigation.

2. See Wal–Mart Stores, Inc. v. Cooper, 997 S.W.2d 823, 825 (Tex.App.—Eastland 1999, pet. denied).

3. See id.

any contrary evidence and inferences.[4] If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails.[5] When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.[6] However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence.[7]

■ Further, if the trial court states no reason why judgment n.o.v. was granted, and the motion for judgment n.o.v. presents multiple grounds, appellant shoulders the burden of showing that the judgment cannot be sustained on any ground relied upon in the motion.[8] In the present case, the trial court did not state whether it was granting Tiller's judgment n.o.v. on the "intentionally and recklessly" element or the "extreme and outrageous" element. Therefore, we address both.

### Legal and Factual Sufficiency

■ In reviewing the legal sufficiency of the evidence to support the jury finding, we consider only the evidence and inferences that tend to support the verdict and disregard all contrary evidence.[9] If more than a scintilla of evidence supports the jury's finding, the legal sufficiency challenge fails.[10]

■ In reviewing a factual sufficiency point for issues to be proven by a preponderance of the evidence, we review all the evidence, both favorable and unfavorable to the jury's verdict, and then determine whether the verdict is against the great weight and preponderance of the evidence as to be manifestly wrong or unjust.[11]

■ Where the burden of proof at trial is by clear and convincing evidence, as is required of a plaintiff requesting exemplary damages,[12] we apply a higher standard of factual sufficiency review.[13] After considering all the evidence, we determine not whether the trier of fact could reasonably conclude that the existence of a fact is more probable than not, as in ordinary civil cases, but whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. Under this standard, we must consider whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established. We will sustain a factual insufficiency complaint regarding liability for exemplary damages only if the fact finder could not

4. *See id.; Cecil Pond Const. Co. v. Ed Bell Investments, Inc.,* 864 S.W.2d 211, 214 (Tex. App.—Tyler 1993, no writ).

5. *See Motsenbocker v. Potts,* 863 S.W.2d 126, 132 (Tex.App.—Dallas 1993, no writ).

6. *See id.*

7. *See id.*

8. *See Guzman v. Synthes (USA),* 20 S.W.3d 717, 720 (Tex.App.—San Antonio 1999, pet. denied) (quoting *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991)).

9. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 (Tex.1997); *Atchison, Topeka & Santa Fe Ry. Co. v. Cruz,* 9 S.W.3d 173, 177–78 (Tex.App.—El Paso 1999, no pet.).

10. *Cruz,* 9 S.W.3d at 178.

11. *Id.*

12. Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a) (Vernon 1997).

13. *Tate v. Tate,* 55 S.W.3d 1, 4 (Tex.App.—El Paso, 2000, no pet.); *Neiswander v. Bailey,* 645 S.W.2d 835, 835–36 (Tex.App.—Dallas 1982, no writ).

have reasonably found the fact was established by clear and convincing evidence.[14] Although the authorities upon which we rely in setting forth this standard do not deal specifically with exemplary damages,[15] we see no reason why their reasoning should not apply here.

### Intentional or Reckless

 To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe.[16] A defendant acts intentionally when he or she either desires to inflict severe emotional distress or knows that such distress is substantially certain to result from his or her conduct.[17] A defendant acts recklessly when the defendant "knows or has reason to know of facts which create a high degree of risk of … harm to another, and deliberately proceeds to act, in conscious disregard of, or indifference to that risk." [18]

 Here, the McLures told Tiller that Bill was dying from a malignant brain tumor and that Barbara was running McLure Precast in addition to caring for Bill. Nevertheless, Tiller made repeated, unnecessary calls during nonbusiness hours to Barbara at her home, screamed at her, threatened to terminate the contract for being behind schedule when it was not, threatened to take over management of

the project and terminate the contract because Bill had died, threatened to bring in other contractors, made accusations that the work was being performed poorly when it was satisfactory, threatened nonpayment (a threat which he carried through), threatened to terminate the contract if McLure Precast closed for the day of Bill's funeral, and harassed McLure's workers by yelling at them and making racial slurs. A jury could reasonably believe that Tiller consciously disregarded any risk that his actions could have caused Barbara McLure, considering the situation she was facing. He also stated that if McLure tried to sue him, he would "break her financially." From all this, the jury could reasonably believe Tiller acted recklessly. Moreover, the evidence even more strongly supports the conclusion that Tiller's conduct was intentional; that he was determined to force Barbara McLure to abandon the project so he would not have to pay McLure Precast its management fee or other amounts owing under the contract, apparently believing that Barbara McLure was too intimidated and demoralized to sue him. We find the evidence legally sufficient to support a finding that Tiller's behavior was intentional or reckless.

### Extreme and Outrageous Conduct

 Extreme and outrageous conduct is conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

---

14. *Tate*, at 4.

15. *Neiswander* involved termination of parental rights. *Tate* involved characterizing property as separate property in a divorce.

16. *See Morgan v. Anthony*, 27 S.W.3d 928, 929 (Tex.2000).

17. *Tidelands Auto. Club v. Walters*, 699 S.W.2d 939, 940–41 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.).

18. *See Escalante v. Koerner*, 28 S.W.3d 641, 646 (Tex.App.—Corpus Christi 2000, pet. denied) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 624 (Tex.1993)).

intolerable in a civilized community.'" [19] Generally, insensitive or even rude behavior does not constitute extreme and outrageous conduct.[20] Similarly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct.[21] Although a single act, taken alone, may or may not rise to the level of "extreme and outrageous" conduct, this Court has previously determined that it is possible that several acts taken together can amount to such harassment as to be more than petty oppression.[22]

In following the RESTATEMENT SECOND OF TORTS, our sister court has stated:

The extreme and outrageous nature of the conduct 'may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.' Outrageous conduct is privileged where the actor 'has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.' Whether conduct is outrageous is initially a question of law for the court. 'Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.' [23]

Tiller argues that his actions were privileged and not "extreme and outrageous" because he was merely insisting on his legal rights in enforcing the contract. We find, however, that a jury could have reasonably believed he intentionally engaged in a continuing course of conduct that exceeded all possible bounds of decency, utterly intolerable in a civilized community. Although he knew that Barbara McLure was susceptible to emotional distress because of Bill's fatal illness, he nevertheless continued to engage in a course of conduct that a jury could have reasonably believed to be harassing, intimidating, bullying, and extreme. Moreover, the jury could reasonably conclude the purpose of this outrageous behavior was *not* to enforce the contract, as Tiller claims, but rather to induce its breach. We do not find the privilege argument persuasive.

Because we find that more than a scintilla of evidence supports the jury's findings that Tiller acted intentionally or recklessly and that his conduct was extreme and outrageous, we conclude the trial court erred in granting Tiller's motion for judgment notwithstanding the verdict. McLure's Issues One, Two, and Three are sustained.

### Tiller's Cross–Points

In his first of four cross-points, Tiller maintains that Barbara failed to establish

**19.** *See Morgan,* 27 S.W.3d at 929 (quoting *Twyman,* 855 S.W.2d at 621 (following RESTATEMENT (SECOND) OF TORTS section 46 cmt. d (1965))).

**20.** *See GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999).

**21.** *See id.*

**22.** *See Household Credit Servs., Inc. v. Driscol,* 989 S.W.2d 72, 82 (Tex.App.—El Paso 1998, pet. denied) (holding that although acts of name-calling, foul language, ill-timed phone calls, repeated phone calls, or threats to make plaintiff's life miserable because she could not pay her VISA bill would not by themselves rise to level of intentional infliction of emotional distress, taken together, along with bomb and death threats, these acts constituted course of conduct that did rise to level of behavior beyond all possible bounds of decency, utterly intolerable in civilized community).

**23.** *See Motsenbocker v. Potts,* 863 S.W.2d 126, 132 (Tex.App.—Dallas 1993, no writ) (citations omitted).

any of the elements of her intentional infliction of emotional distress claim as a matter of law. Because we have already determined that adequate evidence exists to support the jury's findings on the first two elements, we now address the remaining elements, causation and severe distress.

## Causation

■ Tiller argues that there was no evidence that his behavior caused Barbara's emotional distress; rather, it was her husband's terminal illness and being required to run McLure Precast without him that engendered her mental state. The record does not support this assertion. Rather, both Doug Hansen and Deborah Williams testified that Barbara McLure suffered severe distress caused by Tiller's behavior, totally independent of Bill's illness and death, and was of a different character. Barbara McLure testified similarly. This testimony provides us with more than a scintilla of evidence to show that Barbara's distress over Tiller's conduct was separate from the distress she suffered because of Bill's medical condition and death. This argument is without merit.

## Severe Distress

■ Tiller asserts that there was no evidence to support the jury's finding that Barbara suffered from severe distress because she did not seek medical attention. That she was merely upset or stressed, Tiller claims, does not rise to the level of "severe distress."

■ "Severe emotional distress" means distress so severe that no reason-

able person could be expected to endure it without undergoing unreasonable suffering.[24] Any party seeking recovery for mental anguish, even when advancing a cause of action that does not require the "severe" damages required for intentional infliction of emotional distress, must prove more than "mere worry, anxiety, vexation, embarrassment, or anger." [25]

Here, McLure presented evidence that Tiller's conduct caused her to become tired, exhausted, depressed, subdued, and unsure of her future. Receiving repeated telephone calls from Tiller left her "extremely upset," shaking, crying, and intimidated. She lost self-confidence and self-esteem. Her worry over how she was going to pay her employees when Tiller failed to pay her the balance due, left her feeling "very stressed." The reason she did not seek medical attention was because she had no money to do so. She suffered stomach problems, lost weight, had trouble sleeping, and when she could sleep, she had nightmares. A jury could have reasonably found these symptoms to be indicative of severe distress that no reasonable person could be expected to endure it without undergoing unreasonable suffering. Cross–Point One is overruled.

## Mental Anguish Damages

In his second cross-point, Tiller argues that there was legally and factually insufficient evidence to support the jury's award of past and future mental anguish.

In addressing mental anguish damages, we are guided by the Texas Supreme Court's decision in *Saenz v. Fidelity & Guar. Ins. Underwriters*[26] and our own opinion in *Ortiz v. Furr's Supermarkets*.[27] Mental anguish is:

---

24. *See Escalante,* 28 S.W.3d at 646.

25. *See id.* (quoting *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995)).

26. 925 S.W.2d 607 (Tex.1996).

27. 26 S.W.3d 646, 652 (Tex.App.—El Paso 2000, no pet.) (citing also *Worsham Steel Co. v. Arias,* 831 S.W.2d 81 (Tex.App.—El Paso 1992, no writ)).

[A] relatively high degree of mental pain and distress; it is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these, and it includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.[28]

In *Saenz*, the Texas Supreme Court reaffirmed *Parkway Co. v. Woodruff*[29] and found that mental anguish damages could not be awarded without either " 'direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine,' " or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " [30] Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded.[31]

In *Ortiz*, this Court stated:

[M]ental anguish includes a mental sensation of pain resulting from 'such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair or public humiliation or a combination of any of these.' Texas courts have interpreted the definition of mental anguish to mean that recovery is warranted in such cases where the plaintiff's mental pain has risen to such a level that it has rendered him incapable of dealing with certain everyday activities. For instance, as a result of the mental pain, the plaintiff suffers from a myriad of negative emotions. Some of these emotions may manifest themselves in such a way as to make it difficult for the plaintiff to eat, sleep, work, socially interact, or carry on any other activity which, until the time of the alleged injury, he could accomplish on a day-to-day basis without difficulty.[32]

### Past Mental Anguish

Here, Deborah Williams testified that although she was holding up "pretty good" and was "very strong for us" in dealing with her husband's terminal illness and death, her mother would, however, "get stressed" after receiving Tiller's repeated calls. After hanging up with Tiller, Barbara would break down, shaking and crying hysterically. This was very uncharacteristic, as she is a normally very strong person. Deborah testified she believed her mother was about to have a breakdown after one of Tiller's calls. As a result, McLure began having trouble with her stomach, was losing sleep, and lost weight. While she was once a "very jovial person," she was now tired, exhausted, and depressed. Because Tiller refused to finish making payments under the contract, McLure worried about how she was going to pay her employees. Importantly, both Williams and Hansen testified that McLure suffered severe distress because of Tiller's conduct apart from the grief caused by Bill's illness and death. Further, McLure was forced to sell her personal property, lost her home, and had to move in with her son. She was also forced to sell the assets of McLure Precast at "fire sale" prices. A jury could have reasonably concluded such events constituted

---

**28.** *See Ortiz,* 26 S.W.3d at 652.

**29.** 901 S.W.2d 434 (Tex.1995).

**30.** *See Ortiz,* 26 S.W.3d at 653 (quoting *Saenz,* 925 S.W.2d at 614).

**31.** *See id.*

**32.** *See id.*

a substantial disruption in her life. The severe mental emotional distress manifested physically through insomnia, loss of weight, crying, and shaking. We find the evidence was legally and factually sufficient to support the jury's award of past mental anguish damages.

## Future Mental Anguish

■ When asked how Barbara was doing at the time of trial, Deborah Williams testified that although Tiller had stopped making repeated phone calls to her mother, McLure was "still fighting." She still suffered from insomnia. She was still living with her son and his family. Importantly, Williams could see no end in sight for Barbara's mental anguish. Williams testified that for her mother, there has been no closure. When McLure tries to do something, she has no motivation to get it done. Deborah stated at trial that McLure was still very upset that bills remained unpaid. McLure testified that she was still feeling severe distress, she felt as though the rug had been pulled out from under her, she finds it hard to make decisions, and she has trouble grieving. She also testified that she anticipated a future of feeling the ramifications of Tiller's conduct. Because of Tiller's conduct, McLure was faced with a future of financial problems that would lead to continued, severe distress. We find the evidence both legally and factually sufficient to support the jury's award of future mental anguish damages.

■ Tiller also argues that under *Ortiz*, there must be some evidence to justify the amount awarded for Barbara's past mental anguish, and here, there was no such evidence. We disagree. At trial, Barbara entered into evidence three affidavits for mechanic's liens, which showed

that Tiller still owed McLure Precast almost $37,000. She also testified she was forced to break a contract with the government because she had no working capital after her experience with Tiller. Had she been able to perform the government contract, McLure Precast would have seen a profit of $75,000. Instead, McLure had to begin selling her personal property and liquidated McLure Precast's assets. When buyers learned that she was being forced to sell McLure Precast's equipment, they began to take advantage of her, buying the equipment for thousands of dollars less than its worth. Additionally, Barbara was forced to use her credit card to make payroll. A jury could reasonably deduce that she incurred interest charges on this amount. This is some evidence to justify the amounts the jury awarded for her past and future mental anguish. Tiller's Cross–Point Two is overruled.

## Insufficient Evidence that Tiller Acted with Malice

■ In his third cross-point, Tiller contends that the evidence was legally and factually insufficient to support a finding of malice. In addressing the factual sufficiency point, because malice must be shown by clear and convincing evidence,[33] we use the heightened standard set out earlier in the "standards of review" section. Malice is defined as acting with a specific intent to cause substantial injury, or in such a way that the conduct, when viewed objectively from Tiller's standpoint at the time it occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Barbara, and nevertheless proceeded with conscious indifference to her rights, safety, or welfare, despite his actu-

---

**33.** Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a) (Vernon 1997).

al, subjective awareness of the risk involved.[34]

We have already determined that there was legally sufficient evidence to support the jury's finding that Tiller acted with the intent to force McLure to abandon the project. This same analysis supports the legal sufficiency of the jury's malice finding.

In reviewing the factual sufficiency of evidence on malice, Tiller argues that he was justifiably concerned about the state of his project, that he had a significant amount invested, that J.V. McLure admitted that for a time the project was not receiving the attention it deserved, that his admittedly rude, curt, insensitive calls did not rise to the level of malice, that McLure never refused his calls, and that "even if he was a gruff, rude and insensitive businessman, his conduct could not be characterized as offensive to the public sense of justice and impropriety." If that were the entire picture of Tiller's behavior, we would agree. What Tiller omits, however, is strong evidence that his conduct and demeanor were intended to cause McLure to abandon the project before the management fee was due, that he indeed refused to finish payments under the contract, that there was evidence the project was never behind schedule, that it was a good job, and Tiller never placed any of his so-called concerns in writing. We find the jury could reasonably find malice by clear and convincing evidence. Tiller's third cross-point is overruled.

### Exemplary Award was Unreasonable and Excessive

Finally, in a fourth cross-point, Tiller argues that the $1,500,000 jury award for exemplary damages was unreasonable and excessive. Specifically, he urges his conduct was not extreme and outrageous, he did not realize the impact of his conduct, and his calls to McLure merely showed he was genuinely concerned about his project, and were therefore legally privileged.

Exemplary damages must be reasonably proportional to actual damages, although there can be no set ratio between actual and exemplary damages that will be considered reasonable.[35] Unless the award is so large as to indicate that it is a result of passion, or prejudice, or that the evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal.[36] In reviewing awards of exemplary damages, we consider the following factors: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice.[37]

Each of the factors above supports an award of exemplary damages. Although Tiller knew Barbara McLure was facing her husband's death and managing their business without his help, Tiller nevertheless made threats to terminate the contract and made repeated rude, "disgusting" phone calls to Barbara's home during nonbusiness hours. Kyle McCardle, a disinterested witness, recalled Tiller bragging, " 'Well, she wouldn't dare do that [file a lawsuit].' He said that if she tried— if she tried to sue him that he would drag

---

**34.** TEX. CIV. PRAC. & REM CODE ANN. § 41.001(7) (Vernon 1997).

**35.** See Bradford v. Vento, 997 S.W.2d 713, 741 (Tex.App.—Corpus Christi 1999, no pet.).

**36.** See id.

**37.** See id. at 741–42.

her ass back and forth from Dallas to court so many times it would break her financially." Tiller even threatened to terminate the contract if McLure Precast closed its doors on the day of Bill's funeral. Without doubt, this conduct could offend the jury's sense of justice and propriety. We find the jury's exemplary damages award was not excessive.

Tiller next argues that under Section 41.008(b) of the Texas Civil Practice and Remedies Code, the maximum amount of exemplary damages available in this case was $750,000. From our reading of that statute, however, we conclude that the maximum amount of exemplary damages allowable under the statute in this case is $500,000.

The relevant provision states:

**§ 41.008. Limitation on Amount of Recovery**

. . .

(b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1) (A) two times the amount of economic damages; plus

(B) *an amount equal to any noneconomic damages found by the jury,* not to exceed $750,000; or

(2) $200,000.[38]

Thus, although we find that the jury's exemplary damages award was not excessive, it was capped by statute. The jury awarded noneconomic damages totaling $500,000: $250,000 for past mental anguish and $250,000 for future mental anguish. Accordingly, we reform the jury's award of exemplary damages to reflect the maximum amount recoverable, $500,000. To

that extent, Tiller's fourth cross-point is sustained.

### Conclusion

We reverse the trial court's judgment n.o.v., and order that judgment be entered in accordance with the jury's verdict. We reform the jury's award of exemplary damages, however, to the statutory maximum of $500,000. We remand the case to the trial court for entry of judgment accordingly.

---

38. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(b)(1)(A)(B), (2) (Vernon 1997) (emphasis added).