**Leroy H. PIATT, Jr., Appellant,**

v.

**Michael Martin WELCH and The Salvation Army, Appellee.**

No. 08–97–00242–CV.

Court of Appeals of Texas, El Paso.

June 4, 1998.

Alan G. Moravcik, Midland, for Appellant.

Dick R. Holland, Boldrick, Clifton, Holland & Essman, P.C., Midland, for Appellees.

Michael McKinney, Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., Midland, for Interested Party.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Leroy H. Piatt, Jr. appeals from a take-nothing judgment entered in favor of Michael Martin Welch and The Salvation Army following a jury trial. In two points of error, Piatt challenges the legal and factual sufficiency of the evidence to support the jury's finding that Welch's negligence, if any, did not proximately cause injury to Piatt. During oral argument, counsel for Piatt conceded that because the jury did not reach the damage issues, we are unable to render judgment, even were we to find that negligence was established as a matter of law. Accordingly, Piatt has abandoned his legal sufficiency challenge and we proceed directly to a factual sufficiency review. Finding sufficient evidence, we affirm.

## FACTUAL SUMMARY

Welch was "on the program" with the Salvation Army.[1] On May 9, 1994, he was driving a vehicle owned by the Salvation Army. As he was driving down Front Street in Midland, Welch lost consciousness, entered the intersection, and struck the vehicle in which Piatt was a passenger. It was undisputed that Piatt suffered a fractured pelvis. Hotly contested, however, was whether he suffered a closed-head injury or whether his subsequent neurological difficulties arose

---

1. Being "on the program" means that Welch worked for his room and board, including duties as a janitor, as the caretaker of the "lodge" and the day-care center, and as a cook in the lodge. Those duties did not require him to drive but about once every two weeks in order to pick up supplies.

from a stroke occurring months after the accident.

In his second amended petition, Piatt added to his common law negligence claim a contention that Welch violated Tex.Rev.Civ. Stat.Ann. art. 6701d, § 71.[2] In response to this claim of negligence per se, Welch raised the defense of excuse arising from the loss of consciousness.

## THE CHARGE

The jury was instructed that "[w]hen words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning." The following terms were then specifically defined:

> 'Negligence' means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

> . . .

> 'Negligence per se' means the unexcused violation of a traffic safety statute. The law requires that a driver facing a steady red traffic signal shall stop and not enter an intersection until an indication to proceed is displayed. The unexcused failure to comply with this law is negligence in itself.

Question Number One then inquired, "Did the negligence, if any, of Michael Martin Welch proximately cause injuries to Leroy Piatt?" The jury answered in the negative. It did not reach the question of whether the Salvation Army was negligent in entrusting the vehicle to Welch, nor did it reach the damage issues.

## NEGLIGENCE PER SE

In *Impson v. Structural Metals, Inc.*, 487 S.W.2d 694, 696 (Tex.1972), the Texas Supreme Court approved the RESTATEMENT (SECOND) OF TORTS § 288A as substantially

stating Texas law concerning civil liability for violation of a penal statute. That section provides five categories of situations where a statutory violation is excused:

- The violation is reasonable because of the actor's incapacity;
- he neither knows nor should know of the occasion for compliance;
- he is unable after reasonable diligence or care to comply;
- he is confronted by an emergency not due to his own misconduct;
- compliance would involve a greater risk of harm to the actor or to others.

*Murray v. O & A Express, Inc.*, 630 S.W.2d 633, 637 (Tex.1982).

■ Unforeseeable incapacity as a bar to liability in negligence is based upon the principle that one is not negligent if an unforeseeable occurrence causes an injury. Under traditional negligence theory, it follows that Welch was not negligent if he were incapacitated before the collision, the incapacity caused the collision, and his incapacitation was not foreseeable. *Harvey v. Culpepper*, 801 S.W.2d 596, 598 (Tex.App.—Corpus Christi 1990, no writ).

■ Citing *Southern Pacific Company v. Castro*, 493 S.W.2d 491 (Tex.1973), Piatt contends that once he introduced evidence of a violation of a statutory standard of conduct, i.e., evidence that Welch ran the red light, the burden shifted to Welch to prove that the violation was excused or justified. We agree in part. In response to the claim of negligence per se, the burden shifted to Welch to raise the theory of excuse. Once the theory is raised however, the burden of persuasion shifted back to Piatt to prove that the traffic violation was unexcused:

> The basic problem is that of properly placing the burden of persuasion on the excuse contention.

> . . .

It is the *unexcused* violation of a penal standard which constitutes negligence per se. . . . For one to prove negligence per se, therefore, he must prove (1) a violation

**2.** Now Tex.Transp.Code Ann. § 545.051 (Vernon Pamph.1998).

of the penal standard, (2) which is unexcused. [Emphasis added.]

*Id.* at 497, *citing* Prosser, Contributory Negligence as a Defense to Violation of Statute, 32 Minn.L.Rev.

## STANDARD OF REVIEW

■ "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. When the party having the burden of proof complains of an unfavorable finding, the point of error should allege that the findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" point of error is appropriate only when the party without the burden of proof on an issue complains of the court's findings. *Neily v. Aaron*, 724 S.W.2d 908 (Tex.App.—Fort Worth 1987, no writ). Because Piatt shouldered the burden of proof, we will review the evidence to determine whether the jury finding was against the great weight and preponderance of the evidence.

■ The test for factual insufficiency points is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. It is for the jury to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Carrasco v. Goatcher*, 623 S.W.2d 769, 772 (Tex. App.—El Paso 1981, no writ). The jury's finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. *Id.* The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our con-

clusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *See, e.g., Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994); *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied). Thus, we cannot substitute our judgment for that of the fact finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. We now turn to a review of the testimony elicited at trial.

## TESTIMONY ELICITED AT TRIAL

### *Testimony of Michael Martin Welch*

■ At the time of the accident, Welch was in his forties, stood 6'6" tall and weighed 458 pounds. He testified that he had been diagnosed with diabetes in 1990 or 1991, that he was noninsulin-dependent, that he controlled the disease by diet and oral medication,[3] that he had taken his medication on the day of the accident, and that he had checked his blood sugar level on the morning of the accident.

Q. So you were taking Diabeta how often?

A. He had me taking it at this time I think it was twice a day.

Q. Okay. Is that how much you were taking at the time of the accident?

A. Yes, sir, one in the morning and one at night.

Q. Okay. And had you had a diet prescribed to you?

A. Yes, sir, I believe they did.

Q. And what were the terms of that diet?

A. I think he had me on a 2,000 calorie diet or 2,500 calorie diet, I can't remember.

Q. Were there certain foods that you could or couldn't eat?

---

**3.** By the time of trial, the diabetes had worsened; Welch had become insulin dependent and was taking injections.

A. Yes, sir.

Q. What were those?

A. Excuse me, I got to get some water. Cottonmouth. What kind of diet was I on?

Q. Yes, sir.

A. I was on a low sodium diet.

Q. Okay. So you didn't have to worry about what food you ate, but you merely had to worry about the sodium content?

A. Yes, I did.

Q. Now, okay. Who gave you instructions as to your diet?

A. Doctor Calvin Williams.

Q. Okay. Did you religiously follow that diet?

A. Religiously it's hard to follow that diet when you live at the Salvation Army, because they all eat the same kind of food.

Q. Did you advise them that there was some of that stuff you couldn't eat?

A. Yes, I advised them of it, and they told me they didn't have time to cook a special meal just for me.

Q. Okay. So is it your testimony that you really weren't able to follow that diet?

A. No, sir.

Q. Okay. Do you know caloriewise were you able to follow that diet?

A. I don't know, sir.

Q. How much did you weigh at the time of the accident? ·

A. At the time of the accident, I weighed close to 458 pounds.

Q. Okay. How much did you weigh in 1992 when you went to work for the Salvation Army?

A. Around 450.

Q. So about the same?

A. About the same, sir, yes.

Q. Okay. Now, at the time of the accident, Michael, you testified I think previously in deposition that you had been taking your medicine religiously, is that right or wrong?

A. Yes, sir, I believe I was.

Q. Do you know or you just believe?

A. I'm just guessing.

Q. I mean, you don't know?

A. I'm pretty sure I took it. I was always taking my diabetic medicine.

Q. Had you been dehydrated at the time of the accident?

A. No, sir, I don't believe I was.

Q. Had you been drinking large amounts of water?

A. I was drinking some water. I don't know if it was large amounts.

Q. I mean, it wasn't any amount in excess of what you usually drink?

A. Probably a glass of water.

Q. What do you mean by that, a glass of what water what? [sic]

A. Regular size grass [sic] of water.

Q. How often?

A. How often?

Q. Yes.

A. Maybe three or four times a day.

Q. Okay. So that's not a large amount of water, is it?

A. No, no, it's not.

Q. Okay. So you wouldn't consider that as your having been drinking excess amounts of water at the time of the accident, would you?

A. No, sir.

Q. Okay. Did you have any indication or do you have any indication of when your blood sugar gets high, do you feel different?

A. No, sir, to me it just feels the same.

. . .

Q. Okay. Did anybody ever tell you that if you drank large amounts of water, it might be indicative of being dehydrated and high blood sugar existed?

A. It may be because my blood sugar's high.

Q. Yeah. I mean, did you know that?

A. Yes, sir, I did, I believe so.

Q. Wouldn't that be a sign to you that something's wrong with your blood sugar?

A. I had a monitor. When I took my monitor blood sugar, it was the same all the time. It wasn't ever over 200.

Q. You have a monitor for your blood sugar?

A. Yes, sir, I do.

Q. Okay. How did you do that?

A. I would clean my finger off and prick my finger with a gun and pull the blood out and set it on the strip, and the monitor would count down, then it would tell me how high my blood sugar was.

Q. How often did you do that?

A. I did that every day, sir.

Q. Okay. So what time of day did you do it?

A. I did it in the morning, sir.

Q. Did you do it before the—the day before—or the morning of the accident?

A. Yes, sir, I did.

Q. Okay. Did you have an indication of high blood sugar then?

A. It was—I believe it was in the 100 or 200 range, sir.

Q. That wouldn't be high?

A. Well, not for me it ain't.

Q. Okay. Now, and it's your testimony that you took your medicine on the day of the accident, too, is that correct?

A. Yes, sir, I believe so.

Q. And it's your testimony that you weren't drinking excessive amounts of water at that time either, right?

A. I don't remember. I think I was or I wasn't. I'm not sure.

Q. So you don't remember that?

A. No, sir.

Welch further stated that with regard to the accident, he could not recall anything from about a half a block before the accident occurred:

Q. Okay. Were you driving west on Front Street next to the center stripe?

A. Yes, sir.

Q. Okay. And did you enter that intersection against the red light?

A. I don't remember if I did or not, sir.

Q. Okay. Did your vehicle strike the white Chevrolet 1992 pickup?

A. I don't know, sir. I passed out by that time.

Q. Okay. But you were in an accident at that point in time, right?

A. Yes, sir, I was in an accident. They told me I was.

Q. All right. When did you pass out?

A. About half a block before the accident occurred.

Welch claimed he regained consciousness while at the hospital and that he had suffered no other "blackouts," either before or after the accident, nor had he had difficulties with his medication.

Most assuredly, Piatt tried to impeach Welch's testimony. Welch was questioned concerning a statement he had signed indicating that he "was westbound on Front Street in the inside lane and a truck was northbound on Garfield in the outside lane. Michael passed a red light and struck the oncoming truck." Piatt's attorney carefully drew to the jury's attention that Welch had signed the statement, that he had read the statement before he signed it, and that the statement did not reference the fact that Welch was unconscious. Also admitted into evidence was a workers' compensation form including a description of the accident, again signed by Welch, referencing that he had run a red light but silent as to whether he was unconscious at the time. When asked whether he would have told hospital personnel that he had not been taking his medication, he responded, "I don't believe I would." He then emphatically stated without equivocation that he had in fact been taking his medication at the time of the accident, but that he did not remember what he had said at the hospital:

I don't know a lot of things. Everybody was telling me hearsay. I wasn't really there. I was in a what they call la la mood. I was crying a lot, but I don't remember telling them anything, sir.

During closing arguments, defense counsel described Welch for the jury: "[T]he polite

way to put it is he is not the sharpest pencil in the box."

### Testimony of Investigating Officer

At the time that Officer Sanders arrived at the scene of the accident, Welch was being treated by emergency medical personnel. He had suffered a head injury in the accident and EMS technicians had placed a cervical collar on his neck and strapped him to a backboard. Sanders could not specifically remember whether he had spoken with Welch at the scene, but he did state that he would not have interfered with the emergency care administered to Welch. Had he been told by someone at the scene that prior to the accident Welch had been unconscious, he would have so noted on his accident report. The report reflects no such notation.

### Testimony of Emergency Room Nurse

Wendy Sorochan, the emergency room nurse on duty at the time of Welch's arrival at the hospital, testified that she did not personally see or speak with Welch until he had been treated both in the field and en route to the hospital. He arrived at the emergency room some forty minutes after the accident. The triage sheet in the hospital records, however, revealed that at the time Welch arrived, he received a rating on the Glasgow Coma Scale of 15, indicating that he was alert and responding. These records also indicated that someone had told Sorochan, she could not remember whether it was Welch or someone else, that Welch had passed out at the time of the accident. However, she explained that the focal assessment reflected "LOC at scene," which indicates "loss of consciousness." Indeed, the emergency room physician listed Pickwickian Syn-

drome [4] and narcolepsy [5] as possible explanations for Welch's blackout.[6]

Sochoran testified at length concerning discrepancies in the record as to whether Welch had stopped taking his diabetes medication:

Q. Okay. What does it [Plaintiff's Exhibit 9, hospital records] tell you about medication?

A. Capoten, it says Caponten, it's probably spelled wrong, we usually sometimes spell it the way the patient says because they can be confused on the medication, so we just write what they say.

Q. Are you getting this information from the patient, then?

A. I don't know.

Q. Well, I mean, where would you get it?

A. We would either get it from the patient or friend or from whose ever there at that time that can give us that information.

Q. Okay. But you're not getting it from some other record somewhere obviously?

A. No.

Q. Okay. What is that kind of medication?

A. I believe that's—we give it to like heart patients, it's more like a hypertensive type medication.

Q. Okay. Is it for blood pressure?

A. Blood pressure, I believe.

Q. Okay. And what else do you have noted there?

A. Diabetic pills, not taking.

Q. And what does that indicate?

---

4. Pickwickian Syndrome occurs in patients who are obese, have poor pulmonary function, and tend to have breathing difficulties. It can cause loss of consciousness.

5. Narcolepsy is a condition of uncertain cause in which patients pass out or fall asleep.

6. Piatt suggests that because there was no medical testimony establishing that Welch had in fact been diagnosed with or indeed suffered from either Pickwickian Syndrome or narcolepsy, Welch failed to establish incapacity sufficient to

rebut a finding of negligence per se. This argument misses the mark for two reasons. First, there was medical testimony that Welch was a diabetic and Piatt's own medical expert, who was also a previous treating physician of Welch, stated that diabetes can cause blackouts or loss of consciousness. The issue of the *possibility* of either Pickwickian Syndrome or narcolepsy is significant not because it might *explain* the blackout but because it demonstrates that emergency personnel were advised that Welch had indeed lost consciousness before the accident.

A. That indicates that somebody had stated that their patient was not taking the diabetic pills.

Q. So would have been either the patient or someone with knowledge about the patient, is that right?

A. Correct.

Q. Okay. And you don't have any recollection as to which, is that correct?

A. No, I do not.

. . .

Q. Do you see where the doctor's made notations on the far—is that the doctor's notation on the far left?

A. Correct.

Q. Okay. Does he indicate anything about diabetic medicine that you can read? I can't read that writing.

A. Yes, he states morbidly obese, diabetic, off Diabeta two weeks.

Q. Okay. Where would he have gotten that information?

A. Probably the same way, from the patient or from somebody that was there with the patient at that time.

Q. Okay. Is Diabeta the diabetic medicine that's in pill form?

A. It's in pill form, correct.

. . .

Q. Okay. What is your entry there on that, the second entry on that page from the top?

A. It says the time, which we can't tell, pulse 101, respiration 18, blood pressure 127 over 92, chemistry done, result 397.

Q. What does that mean?

A. That's the results of chemistry for CBG, which is blood glucose level, which is a sugar level.

Q. Okay. So is that an accurate measurement of the blood glucose level?

A. Right, correct.

Q. Okay. And it was a 397?

A. Correct.

Q. Okay. Now, what does it go on to say?

A. 'Patient states drinking water plus plus plus for several weeks, not taking pain med.'

Q. Okay. Now, is he telling you that he's been drinking excessive amount of water, is that what's he's saying?

A. Correct.

Q. For several weeks?

A. Correct.

Q. Okay. And what does that tell you? That he's dehydrated?

A. Could be dehydrated, a lot of patients, when their blood sugar pressures are high, they become thirsty and they drink water.

Q. You would have garnered that information from him, is that correct?

A. Correct.

Q. He says not taking pain, is that pain?

A. It's pain, correct.

Q. Pain medicine?

A. Correct.

Q. We don't have any pain medicine listed over on medications, do we?

A. No, we don't.

Q. We do say he's not taking his diabetic pill?

A. Correct.

Q. Would you—could that possibly be referring to diabetes medicine? [Objection made and overruled]

A. I don't know.

Q. Okay. That's fine. That's fine. He wasn't taking some kind of medicine for several weeks, is that correct? You listed pain?

A. I listed pain, correct.

### Testimony of Dr. Dipak Patel

In a peculiar twist of events, it so happened that Piatt's expert witness, Dr. Dipak Patel, had treated not only Piatt, but Welch as well. He testified to the medical conditions of both patients. As to the effects of elevated blood sugar levels on diabetics, the doctor noted:

Q. We have some indication, Doctor Patel, that you treated Mr. Michael Mar-

tin Welch. Do you remember us talking to you about that?

A. Yes, sir.

Q. Okay. Do you recall him at all?

A. Now I guess I can to some extent.

Q. Do you remember when you see him you kind of recognize him?

A. Yes.

Q. Okay. But you don't recall how you treated him or anything without the records, is that right?

A. No, sir.

Q. Okay. Now, he's been diagnosed as at least initially by you as a noninsulin-dependent diabetic. Would you explain to the jury what that condition is and what needs to be done?

A. The noninsulin-dependent diabetes is what they classify now as adult onset diabetes when you get in later part of your life. Most of times usually is controlled with the diet, exercise and the medication. Very early you end up taking insulin to control the sugar.

Q. Later on are you saying?

A. Most of them do, they are controlled with the medication and diet.

Q. Okay. Would medication be required on a daily basis?

A. Depends upon blood sugar, but most of them do end up taking some form of medication.

Q. Okay. On a daily basis?

A. Yes, sir.

Q. Okay. Are they routinely instructed that they must take this on a daily basis without fail?

A. Yes, sir.

Q. Are they instructed that—what would be the result if they do not take their pills on a daily basis?

A. Usually within days, their blood sugars start getting higher and higher.

Q. Okay. Do they become dehydrated when their blood sugar gets high?

A. Blood sugar goes beyond certain limit, yes, sir.

Q. Okay. What happens when they become dehydrated.

A. It becomes a cycle of blood sugar going higher, getting more dehydrated, getting more weakness and is become a vicious cycle, higher and higher blood sugar.

Q. Do they tend to have a desire to drink a lot of water?

A. Yes, sir.

Q. Okay. Are they instructed routinely that in the event that they start having desires to drink abnormal amounts of water, that that might mean their blood sugar level is elevated? [Objection urged and sustained]

Q. What are the instructions with regard to if they start drinking a lot of water?

A. The—usually dietitians [sic] who give instructions regarding the diet and the medication, they have instructions regarding the diet itself, the of course [sic], checking the blood sugar and the water intake. They are not specific instructions for just the fluid aspect of it. It's a part of the—all instructions include everything, the diet, the medication and the food intake.

Q. What routinely would, if anything, a diabetic be told about an abnormal desire to drink water?

A. The routine instruction for abnormal is—in diabetics is, of course, keep on maintaining the food intake as much as someone can, check the blood sugar as quickly as they can get it checked, and of course, avoid any form of the condition which can make you lose more water, like avoiding excessive temperature or working outside or exercise or something of that nature.

Q. Okay. What is the possible ramifications or results from the blood sugar level getting up in the 600 was it parts per thousand, what is it?

A. I'm sorry, I don't understand the question.

Q. Well, if you have a glucose level of 600 or above, is it parts per thousand or how is that?

A. Yes, if the blood sugar is that high.

Q. What are the results to the one who has high, possible results?

A. The blood sugar about 600 is fairly high blood sugar. It does make your body put in state of dehydration [sic]. It impasse a kidney problems [sic], it impasse everything as a whole, it impasse your concentration and day to day activities slows down. Most of the patients do end up in the hospital with that high sugar.

Q. Will they notice it if they have high blood sugar if they get up that high?

A. Yes, they do notice, yes, sir.

Q. Okay. Is it possible, then, that they lose consciousness?

A. Yes, sir.

Q. *Are they advised that if it gets high, they may lose consciousness?*

A. *Not per se, there's not an instruction per se given to diabetics, but of course, this becomes a part of the checking the sugar.* [Emphasis added].

. . .

Q. [Diabetes] [g]ets progressive, it gets worst [sic] over time, does it not?

A. Yes, sir.

Q. A coma can occur, can it not?

A. Yes, sir.

Q. A coma can be caused by blood sugar getting too high or too low?

A. Yes, sir.

Q. It's possible for a diabetic to pass out, is it not?

A. Yes, sir.

Q. And I asked you the question as to whether you doubted Mr. Welch passing out, and you said that you did not doubt anyone could pass out?

A. Yes, sir, with diabetes anybody can, yes, sir. [Objection urged; no ruling made]

Q. Mr. Welch has said that he passed out at the scene. You don't doubt that that could happen, do you?

A. No.

There is more than sufficient evidence to establish that Welch did in fact suffer a blackout before the accident which was likely caused by his diabetic condition. Whether Welch was negligent in the failure to maintain his diabetes is a closer question. We conclude, however, that the jury was entitled to believe Welch when he testified that he had never suffered a blackout before or since, that he took his medication religiously, that he did so on the day of the accident, that he checked his blood sugar level on the morning of the accident, and that it was within the 100 to 200 range which was normal for him. The hospital records were internally inconsistent as to whether Welch had stopped taking the Diabeta or a pain medication. The emergency room nurse could not testify that Welch had told her he had quit taking Diabeta. The emergency room physician did not testify. Further, the jury heard Dr. Patel acknowledge that diabetic patients are not routinely advised that failure to maintain their blood sugar levels could lead to a loss of consciousness. While we might reach a different conclusion, we are not at liberty to substitute our judgment for that of the jury. We conclude that the jury finding is not against the great weight and preponderance of the evidence. Points of Error Nos. One and Two are overruled.

## DENIAL OF JNOV AND MOTION FOR NEW TRIAL

We pause to note that the actual points of error urged by Piatt are couched in language that the trial court erred in overruling the motion for judgment non obstante veredicto and motion for new trial because there was no evidence or insufficient evidence to support the verdict. In reality, these challenges are specifically to the sufficiency, or insufficiency, of the evidence. The filing of a motion for JNOV or a motion for new trial are merely methods of preserving error for purposes of challenging evidentiary sufficiency on appeal. Having found sufficient evidence to support the jury's verdict, we find that the trial court did not err in overruling either Piatt's motion for judgment non obstante veredicto or the motion for new trial. We affirm.