THE ATCHISON, TOPEKA AND
SANTA FE RAILWAY CO. and
Stephen Guerrero, Appellants,

v.

Jaime Antonio CRUZ, Guardian of the Person and Estate of April Gutierrez and JASON Gutierrez, Minor Children, Consuelo M. Decruz, Jose and Josefina Gutierrez, Eddie Gutierrez, and Liroy Gutierrez, Appellees.

No. 08–97–00639–CV.

Court of Appeals of Texas,
El Paso.

July 14, 1999.

Rehearing Overruled Aug. 25, 1999.

---

174

John S. Howell, Cynthia S. Anderson, Kemp, Smith, Duncan & Hammond, P.C., El Paso, John L. Hill, Jr., Harold K. Watson, Liddell, Sapp, Zivley, Hill & Laboon,

L.L.P., James E. Essig, Houston, for Appellants.

Kevin Thomas Glasheen, Fadduol & Glasheen, P.C., Lubbock, Steven L. Hughes, Mounce, Green, Myers, Safi & Galatzan, Jaime A. Villalobos, El Paso, Sam L. Fadduol, Fadduol, Glasheen & Valles, P.C., Orrin L. Harrison, Vinson & Elkins, Dallas, Thomas S. Leatherbury, Gwendolyn Johnson Samora, Vinson & Elkins, L.L.P., Dallas, for Appellees.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## O P I N I O N

DAVID WELLINGTON CHEW, Justice.

This is an appeal from a wrongful death case. The Appellees are the survivors of Gregorio, Maria, and Gregorio Gutierrez, Jr., who were killed when their car was struck by a train operated by the Appellants.[1] The jury awarded approximately $16.5 million in compensatory damages and $44 million in punitive damages. We affirm the verdict as to negligence, affirm the awards of compensatory damages, and reverse the award of punitive damages.

On the morning of August 16, 1993, Gregorio Gutierrez; his wife, Maria; and one of their sons, Gregorio Jr., were killed when their car was struck by a train operated by the Atchison, Topeka & Santa Fe Railway Company ("Santa Fe"). The accident occurred at a rural crossing near Friona, Texas as Gregorio was on his way to work. Appellees brought a cause of action for wrongful death against the railroad and Stephen Guerrero, the engineer operating the train that struck the Gutierrezes' car.

Appellees are family members of the decedents. Specifically, they are Maria and Gregorio's surviving children, April, Eddie, and Jason Gutierrez; Maria's mother, Consuelo M. DeCruz; Gregorio's parents, Jose and Josefina Gutierrez; and Gregorio's son from his first marriage, Liroy Gutierrez.

Appellees alleged Santa Fe and Guerrero were negligent in failing to sound the whistle as required by law, failing to apply the brakes and keep a proper lookout, and that the crossing was extra-hazardous. Appellees also alleged that Santa Fe was grossly negligent because the failure to sound the whistle and keep a proper lookout were recurring problems of which the railroad was aware and that Santa Fe was aware that the crossing was extra-hazardous.

Appellants challenge the verdict of the trial court on three grounds. First, Appellants contend that Appellees failed to prove that Santa Fe and Guerrero were liable for the accident. Specifically, they challenge the evidence of proximate cause. Second, Appellees argue that the amount of compensatory damages are excessive and are not supported by the evidence. Lastly, Appellees urge that the evidence is not legally and factually sufficient to support the award of punitive damages.

### The jury's finding that Santa Fe and Guerrero were negligent is supported by both legally and factually sufficient evidence.

 Appellants attack the jury's finding of negligence on both legal and factual sufficiency grounds. When both legal and factual sufficiency issues are raised, we must review the legal sufficiency point first to determine whether there is *any* probative evidence to support the jury's verdict. *See Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981)(per curiam). The standard of review for an attack on the legal sufficiency of the evidence requires us to consider only the evidence and inferences that tend to support the jury's verdict and disregard all the evidences and inferences to the contrary and determine whether there exists any probative evidence to support the find-

---

**1.** No cause of action was brought for the death of Gregorio Jr.

ing. *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 (Tex.1997); *Kimsey v. Kimsey,* 965 S.W.2d 690, 699–700 (Tex. App.—El Paso 1998, pet. denied). If more than a scintilla of evidence supports the jury's finding, the legal insufficiency or "no evidence" point of error does not succeed. *See Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996); *Kimsey,* 965 S.W.2d at 700. The test for the application of this no evidence/scintilla rule is that if reasonable minds cannot differ from the conclusion that the evidence offered to support the existence of a vital fact lacks probative force, it will be held to be the legal equivalent of no evidence. *See Kindred v. Con/ Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983), *citing Seideneck v. Cal Bayreuther Assoc.,* 451 S.W.2d 752, 755 (Tex.1970); *Joske v. Irvine,* 91 Tex. 574, 581–82, 44 S.W. 1059, 1062 (1898).

■ The standard of review for factual sufficiency of the evidence requires us to review the evidence, both favorable and unfavorable to the jury's verdict, and then determine whether the verdict is so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951); *Piatt v. Welch,* 974 S.W.2d 786, 789 (Tex.App.—El Paso 1998, no pet.). Because Appellants did not bear the burden of proof at trial, this is properly an "insufficient evidence" point of error. *See Piatt,* 974 S.W.2d at 789; *Lozano v. H.D. Indus., Inc.,* 953 S.W.2d 304, 319 (Tex. App.—El Paso 1997, no writ).

■ The question of proximate cause generally involves a practical inquiry based on common experience applied to human conduct. *See Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex. 1995). The two elements of proximate cause are cause-in-fact and foreseeability. *See Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 549 (Tex.1985); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 789 (Tex.App.—El Paso 1996, writ

denied). Cause-in-fact means the negligent act or omission was a substantial factor in bringing about the injury, without which no harm would have occurred. *See Nixon,* 690 S.W.2d at 549. Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *See Nixon,* 690 S.W.2d at 549–50; *Duran,* 921 S.W.2d at 790. The danger of injury is foreseeable if its general character might reasonably have been anticipated. *See Nixon,* 690 S.W.2d at 550; *Duran,* 921 S.W.2d at 790. It asks whether the injury "might reasonably have been contemplated ..." as a result of the defendant's conduct. *McClure v. Allied Stores of Tex., Inc.,* 608 S.W.2d 901, 903 (Tex.1980).

■ A review of the evidence favorable to the jury's verdict includes the testimony of two "ear" witnesses, James Atwell and Daniel Lopez. Both testified that they did not hear the train blow its whistle before the crossing that was the scene of the accident. When Mr. Atwell was asked if he was certain he did not hear the whistle blown before the crossing his reply was, "Sir, without a doubt in my mind, I go to my grave, I did not hear the whistle blow that day." This evidence supports the Appellees allegation that the train crew failed to sound the whistle as required. Additionally, both of the "ear" witnesses testified that they heard the train apply its brakes only *after* they heard the train strike the Gutierrezes' car. This supports the Appellees' contention that the train crew failed to properly apply the brakes.

The conductor's report provides evidence that the crew was not keeping a proper lookout. This report was made on the day of the accident and indicates that the Gutierrezes' car was first spotted by the crew when it was only 100 yards in front of the train. The railroad's representative, Stephen Rice, testified that if the 100–yard distance was correct, then the crew was not keeping a proper lookout. This evidence is more than the scintilla

needed to satisfy a legal sufficiency or "no-evidence" standard.

We will now turn our attention to a factual sufficiency review of the evidence. In addition to the standard for factual sufficiency stated earlier, this Court is prohibited from substituting our judgment for that of the jury, even if a different result could be reached upon review of the evidence. *See Kimsey*, 965 S.W.2d at 700; *Cain v. Pruett*, 938 S.W.2d 152, 159 (Tex.App.—Dallas 1996, no writ). It is the role of the jury to decide the credibility of the witnesses, the weight to be given to their testimony, and to resolve conflicts in the evidence. The jury may accept or reject all or part of a witness's testimony. *See Cain*, 938 S.W.2d at 159.

In this case, the testimony of the "ear" witnesses, James Atwell and Daniel Lopez, as to the blowing of the train's whistle was contradicted by the testimony of the engineer, Stephen Guerrero, and the conductor, Robert Baker. Guerrero testified that he blew the whistle at the whistle board and continued to blow it until the time of impact. Baker was not sure if the whistle was blown at the whistle board, but was sure it was being blown after he spotted the Gutierrez car on the tracks. However, Guerrero was impeached on almost every material point in his testimony and Baker admitted he did not pay attention every time his train passed a whistle board even though he was responsible for blowing the whistle if the engineer failed to do so. Both Guerrero and Baker admitted that they did not apply the brakes immediately after seeing the Gutierrez car on the tracks in front of them. Guerrero's testimony indicates he did not apply the brakes until impact or very close to it, because, even though the car had been on the tracks for several seconds, he thought the car would move off of the tracks. This was after he claimed at trial that he had spotted the Gutierrez car on the highway before it even made the left-hand turn that was required to approach the crossing. Baker's testimony is much the same, that the brakes were not applied until two seconds or less before impact.

Evidence also existed that an "event recorder" was on the train. An event recorder is placed on a locomotive to track elements such as speed, whether the brakes are being applied, air pressure, and throttle. Very soon after the accident occurred, a wire report was sent to a communications center for the railroad. This wire report indicated that data from the locomotives would be downloaded at a location in Belen, New Mexico, and the results would be sent to Fitzgerald and Mueller.[2] In their depositions, both Engineer Guerrero and Conductor Baker testified that they believed an event recorder was on the locomotive. At trial, however, Guerrero and Stephen Rice, a railroad representative, testified that only even-numbered locomotives were equipped with event recorders and the locomotives involved in this accident were odd-numbered.[3] The jury was given an instruction concerning destruction of evidence which, if they believed evidence had existed, allowed them to infer that the evidence that was destroyed favored the opposing party. This instruction is not challenged on appeal.

The jury is sole judge of the credibility of witnesses and can choose what testimony to believe or disbelieve. In this case, the jury found the testimony in favor of the plaintiffs to be reliable to such an extent that they found that negligence on the part of the railroad was the proximate cause of this accident. We will not substitute our judgment for theirs and cannot say that the verdict was against the great weight and preponderance of the evidence

**2.** Mueller was an investigator for the railroad. It is unclear from the record who Fitzgerald is.

**3.** Conductor Baker did not testify at trial. The videotape of his deposition was played for the jury.

in this case. The evidence is factually sufficient to support the verdict.[4]

■ Appellants also ask this Court to find that Gregorio Gutierrez was contributorily negligent as a matter of law and complain that the jury's finding of no contributory negligence is against the great weight and preponderance of the evidence. Appellants bore the burden of proving Mr. Gutierrez was contributorily negligent. *See Furr's, Inc. v. Logan*, 893 S.W.2d 187, 193 (Tex.App.—El Paso 1995, no writ). Appellants contend that the evidence conclusively established Mr. Gutierrez' negligence because he saw, or should have seen the train. Even though Appellants admit that no one really knows what happened before the train struck the car, they ask this Court to overturn the jury's finding on this issue. The only evidence Appellants introduced at trial to suggest Mr. Gutierrez was contributorily negligent was the testimony of Engineer Guerrero where he said he spotted the Gutierrezes' car on the highway and that it never stopped before it got to the tracks. This live testimony from Mr. Guerrero contradicted his previous deposition testimony and the jury was entitled to disbelieve him if they so chose. At trial, Appellees introduced evidence to suggest that the sun was blinding Mr. Gutierrez at the time he was crossing the tracks. Appellants argue that even if this is so, Mr. Gutierrez was required to use greater care because of the sun blindness. However, Appellants could not establish that Mr. Gutierrez was not exercising due care and the jury heard ample testimony that Mr. Gutierrez was a careful driver and that he would "always" stop at the railroad tracks to check for trains.

### Compensatory Damages

Appellants also challenge the award of compensatory damages for pecuniary loss, loss of companionship and society, and mental anguish. Appellants challenge the factual sufficiency of the pecuniary loss awards and both the legal and factual sufficiency of the "intangible" awards for loss of companionship and society and mental anguish.

### Pecuniary Loss

■ "Pecuniary loss" was correctly defined in the jury charge as "loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value...." *See Samco Properties, Inc. v. Cheatham*, 977 S.W.2d 469, 480 (Tex.App.—Houston [14th Dist.] 1998, pet. denied); *John Deere Co. v. May*, 773 S.W.2d 369, 379 (Tex.App.—Waco 1989, writ denied).

■ The Houston and Waco Courts of Appeals have both noted that the measure of pecuniary loss is "speculative and imprecise and is therefore best left to the jury's common sense and sound discretion." *Samco*, 977 S.W.2d at 480; *John Deere Co.*, 773 S.W.2d at 379–380. These Courts have not limited evidence on pecuniary loss to testimony of monetary valuation, but have included testimony of the relationship between the parties and the deceased's behavior toward the beneficiary. *See id.* This record contains sufficient evidence for the jury to estimate damages for pecuniary loss from the deaths of Maria and Gregorio Gutierrez for Eddie, April, and Jason Gutierrez; Jose and Josefina Gutierrez; and Consuelo DeCruz.

■ Appellants object to the size of the award for pecuniary loss and argue that it is or should be restricted to only pecuniary contributions to the survivors so as to prevent a double recovery. However, Appellees correctly note that this instruction was not objected to at trial and

---

4. An alternative theory of negligence, an extra-hazardous crossing, was also submitted to the jury. Because we find that the evidence is sufficient to support the verdict on a traditional negligence theory, we decline to address the issue of an extra-hazardous crossing. *See Federal Pac. Elec. Co. v. Woodend*, 735 S.W.2d 887, 896 (Tex.App.—Fort Worth 1987, no writ).

therefore any complaint that the jury charge included loss of care, maintenance, support, services advice and counsel in calculating the pecuniary loss is waived. *See* Tex.R.App.P. 33.1; *Green Intern., Inc. v. Solis,* 951 S.W.2d 384, 389–90 (Tex.1997); *Sanchez v. King,* 932 S.W.2d 177, 183 (Tex. App.—El Paso 1996, no writ).

We find that all of the damages for pecuniary loss are supported by the evidence. Each plaintiff except Josefina Gutierrez personally testified as to how the deaths of Maria and Gregorio Gutierrez had affected their lives. The children testified to the support and care their parents gave them and how the loss of their parents had changed their lives. Eddie Gutierrez was seventeen at the time his parents were killed. He testified that his mother took care of the children by buying their clothes, making sure they were eating properly, and encouraging them in school. Eddie particularly appreciated the advice, guidance, and support of his mother and father when his first child was born, shortly before this accident occurred. His parents provided financial support for clothing, telephone, and electricity and his mother helped Eddie and the baby's mother learn how to care for the baby. His parents encouraged him to take responsibility for the child he fathered and helped he and the mother move into a place of their own. Eddie's father regularly provided Bible lessons and advice on how to handle problems at school.

April Gutierrez was twelve years old when her parents and brother were killed. She testified that her mother would give her advice on problems with friends and that she misses that advice. Her father was protective of her, was very proud of her, and would "brag" on her to his relatives and friends. Her parents both thought it was very important for her to go to college. Her father educated her in his religious beliefs and gave the children reading assignments from the Bible. He taught her and the other children how to say the blessing at mealtimes. She was very proud of her father and the fact that he was respected in the community.

Jason Gutierrez also testified about his relationship with his parents. He was seven years old at the time of the accident and eleven at the time of trial. He related that his father liked to tell jokes to make him laugh and taught Jason how to fish. Gregorio also taught Jason Bible stories. Jason went almost everywhere with his mother. He would go to work with her and help her empty the trash. His last memory of her is the trip they took to Mexico to see Jason's grandparents, shortly before the accident.

In addition to the testimony of the children themselves, the record is replete with testimony from family and friends attesting to the devotion and attention of Maria and Gregorio to their family. The pastor of the Gutierrezes' church testified that Gregorio was a friend to the children, but would "generally talk to them to point out their errors." Jaime Cruz, the brother of Maria Gutierrez, testified that the family was "very close" and had a "good relationship." Beatrice Cruz, Jaime's wife, described Maria as the "perfect mother" who would "make sure that they [the children] weren't lacking anything." Just prior to the accident, Maria was helping Eddie with his new baby on a daily basis. The second eldest son, Gregorio Jr., worked with his father and was an "exceptional young man" before his death. The record supplies more than ample evidence for this Court to conclude that the loss the children suffered in the way of care, maintenance, support, services, advice, and counsel easily rises above the amount of money Maria and Gregorio were projected to earn in their lifetime.

■ Consuelo DeCruz, Maria's mother; and Jose and Josefina Gutierrez, Gregorio's parents, were also awarded $3,000 each for the deaths of their respective children. Their awards are also supported by the evidence presented at trial. When Mrs. DeCruz came to the United States to visit her family here, she always stayed

with Maria and Gregorio and was provided for by them during her visits. April testified that Maria and Consuelo were so close that "anything that my Grandma liked, [Maria] would give it to her right away...." Mrs. DeCruz testified that Maria "helped [her] a lot" and was "always taking care of all [Maria's] brothers and sisters...."

Jose Gutierrez testified that when Gregorio came to visit that he would help work the land. Gregorio also sent clothes, shoes, and money to his parents. His parents appreciated this because they needed the help Gregorio provided. The testimony of Consuelo DeCruz, Jose Gutierrez, and others support the awards for pecuniary loss the jury awarded to Consuelo DeCruz, Jose, and Josefina Gutierrez.

### Loss of Society and Companionship and Mental Anguish

■ Loss of companionship and society was defined in the charge as "the loss of the positive benefits flowing from the love, comfort, companionship, and society [of the decedent]...." Mental anguish was defined as "the emotional pain, torment, and suffering experienced by [plaintiff] because of the death of [decedent]." Mental anguish damages must meet the evidentiary standard set by the Texas Supreme Court in *Saenz v. Fidelity & Guaranty Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). This test requires either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Saenz*, 925 S.W.2d at 614, *quoting Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995). The Supreme Court reaf-

firmed the use of this test for mental anguish damages in all cases where mental anguish is recoverable in *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex.1997), and noted that wrongful death cases are one of the rare types of cases from which mental anguish damages may be naturally expected. We affirm the awards for loss of companionship and society and mental anguish for all of the Appellees.

■ Appellants urge this Court to find that the damages awarded to the surviving children for loss of companionship and society and for mental anguish are excessive. They further urge the Court to adopt a federal standard for measuring damages and reduce or overturn the awards. *See Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir.1990). We decline to do so. The standard used in the *Douglass* case was a federal "maximum recovery" standard which compared awards in other cases in Texas. *See id.*

First, the Appellants present no reason as to why this standard should be adopted by the Texas courts nine years after the Fifth Circuit's decision, replacing well-established legal and factual sufficiency standards. Second, this method of comparing awards in other cases was self-described by the Fifth Circuit as a "loosely defined," judge made rule, *see Douglass*, 897 F.2d at 1344, hardly a tribute to its reliability. Appellants here, like the appellants in the *Douglass* case, only use information from *reported* cases to argue that the awards for intangible damages to the Gutierrez children should be reduced. The Fifth Circuit made clear that the maximum recovery rule applies to awards in all factually similar cases in the jurisdiction, appealed and reported, or not.[5] *See id.* at 1344. Here lies the flaw of their analysis. As long as the Gutierrez childrens' award does not exceed 133 percent of the highest award for loss of companionship and soci-

---

**5.** Neither Appellants nor Appellees (who propose the adoption of the rule) have declared that the awards for intangible damages to the Gutierrez children are the highest ever re-

ported in a Texas case where a minor child was orphaned by both parents' wrongful death.

ety and mental anguish to one other child for the death of their parents in Texas in a wrongful death case, the award is not excessive. If the award does exceed 133 percent of the highest award to date, the court is to reduce the award, then making it the highest award, and the new standard.[6] Thus, the maximum recovery rule is a damages "cap." Such limits are best imposed by legislative bodies, not courts. If the Texas Legislature wishes to enact a law that determines the appropriate amount for juries to award for intangible damages, it may certainly do so, but this Court will not act in such a manner.

Additionally, there are reported awards that suggest that the amounts here are not so large as to "shock the conscience." In *C & H Nationwide, Inc. v. Thompson,* 810 S.W.2d 259, 265 (Tex.App.—Houston [1st Dist.] 1991), *rev'd on other grounds,* 903 S.W.2d 315 (Tex.1994), the Court of Appeals upheld loss of companionship and society and mental anguish damages of $4 million to a wife for her husband's death. Appellants offer no explanation as to why a parent would always be less important to a child than a husband is to a wife. The surviving children in *C & H Nationwide* were awarded less, but in that case, they had lost only one parent. The surviving children here have lost both parents. In *Uniroyal Goodrich Tire Co. v. Martinez,* 928 S.W.2d 64, 75 (Tex.App.—San Antonio 1995), *aff'd,* 977 S.W.2d 328 (Tex.1998), the children of a permanently injured father were awarded $1 million each for loss of their father's companionship. The father was seriously affected by his head injury, but the children were not wholly deprived of his company.

The Appellants admit that the Plaintiffs "presented evidence showing the *existence* of mental anguish and loss of society and companionship . . . ," therefore we need not examine the legal sufficiency of such damages and will proceed directly to a factual

sufficiency review. The evidence showed that Eddie, April, and Jason Gutierrez were very close to their parents and their older brother. Every witness that knew the family testified to the extreme devotion of the parents to the children. A counselor, who worked with the children for two months in the fall of 1993, testified that April had outbursts at her aunt and uncle, Jason had night terrors, and both children were under extreme stress because it was not certain they would remain with their aunt and uncle. This counselor also testified that she believes that the grieving process will never fully be resolved for these children. In her five years of counseling, she had seen about two hundred patients a year and had never personally treated or heard of a tragedy of this magnitude.

Eddie Gutierrez testified concerning his life before and after the loss of his parents. He would spend time with his father at his father's job, his mother took care of the children and planned special meals for his birthday. The family attended every church service together. In the year before his parents and brother died, he spent almost every day with his father, working with him. When his parents died, as the oldest remaining son, age seventeen, he had to help make the burial arrangements for his parents and sign the papers at the funeral home. Since the death of his parents and brother, Eddie has not been able to stay in one place. He testified this was because he thought if he moved where he "hardly knew anybody it would be easier because I wouldn't remember." He left Friona after three or four months and has lived in Mexico, Houston, and Denver. After returning from the funeral in Mexico, he was unable to work. He could only think about the deaths of his parents and brother. He was not able to be a parent to his daughter, and at this time, has lost contact with his child and her mother. He

**6.** Of course, this method of comparison does not take into account any damages awarded

in cases that settle before trial.

believes he, his daughter, and the child's mother would still be together with the help of his parents. He stated that he would tell his parents how much he needs them and misses them if he had the chance.

April Gutierrez also relayed fond memories of her parents and their close-knit family. A psychotherapist that examined her and Jason testified that the family had a "better-than-average relationship, better-than-average family cohesiveness." She testified that the family would eat dinner together when her father came home from work, they would go to church together and eat out afterwards. They took family vacations to Mexico to visit their grandparents. April had to be sedated when she heard the news of the deaths of her parents and brother. She also related how her life has changed since moving in with her aunt and uncle. She and Jason live with her aunt, Beatrice Cruz, and uncle, Jaime Cruz, and their three children in a two-bedroom apartment. The seven of them share one bathroom. She felt bad that her aunt would sleep on the floor so she and Jason did not have to. April and Jason have also had to abandon the Baptist religion and attend the Catholic church since coming to live with the Cruzes. April also has a constant concern that she and Jason will be separated due to the hardships posed by them both living with her aunt and uncle. She likened that to "taking a big piece of me again." Although it has been four years since her parents' deaths, April still asks "God to please let [her] parents sit on [her] bed ..." at night when she says her prayers so she can talk to them. She asks God to let them hug her.

Jason Gutierrez related similar instances of the family relationship and his relationship with his mother and father. He spent almost all of his time with his mother. According to his aunt, they were never separated. His awards for loss of companionship and society and mental anguish were accordingly larger for the loss of his

mother. He testified that nothing a therapist has done for him or anything that people have said or done has helped him get over the pain of losing his parents. The psychotherapist that testified at trial said the grieving process is not over for either Jason or April, and Jason should be monitored for depression. She testified that Jason is afraid to let himself behave like a child normally would, mainly because he feels very unstable in the environment in which he is currently living.

The evidence presented shows that the surviving children are experiencing ongoing grief, anxiety, and sadness over their parents' death. Eddie's rootlessness and inability to cope with his responsibilities are certainly "more than mere worry, anxiety, vexation, embarrassment, or anger." *Saenz,* 925 S.W.2d at 614. April and Jason meet both tests in *Saenz.* They have a high degree of anguish that substantially disrupts their daily lives and it amounts to more than mere worry, frustration, embarrassment, or anger. The damages for loss of companionship and society are also sufficiently supported by the evidence. The children all desperately miss the sense of having the entire family together as a unit and will suffer those effects for a long time to come.

Appellants complain that the awards are not reasonable and are excessive, but the evidence in this case indicates that the jury did not "simply pick a number and put it in the blank." *Saenz,* 925 S.W.2d at 614. The amount of damages must fairly and reasonably compensate Eddie, April, and Jason. The awards in this case are large, but the plaintiffs here were all children at the time the cornerstone of their family was taken from them. The evidence indicates that four years after this accident, the grief of the children does not seem to be at all assuaged by the passage of time. The Appellants claim that no evidence was presented to justify the amount of damages, but the record clearly indicates that Appellees' economist gave the jury guidelines in how damages for

intangible elements could be calculated. He did not tell the jury how much they should award, but he was not required to. *Saenz* only requires that there be "some evidence to justify the amount awarded," not that the jury be instructed as to how much is appropriate. *Saenz*, 925 S.W.2d at 614. Indeed, *Saenz* reaffirmed that a jury must have some discretion in evaluating these claims. *See id.*

In this case, the awards were larger for the younger children, reflecting that they had lost their parents for a greater part of their childhood, which almost certainly would have been spent under the care of their parents. Eddie, the oldest child, was awarded $850,000 for loss of companionship and society, $850,000 for mental anguish for the death of his mother and the same for the death of his father. April was awarded $1,051,000 for loss of companionship and society and $1,051,000 for mental anguish for the loss of her father and $1,260,000 for each element for her mother's death. Jason, as the youngest, was generally awarded a larger amount, $1,250,000 for the loss of companionship and society of his father, $1,625,000 for mental anguish for the loss of his father, $1,500,000 for the loss of companionship and society for the loss of his mother, and $1,750,000 for mental anguish for the loss of his mother. The higher awards for his mother's death reflect the evidence that he and his mother were extremely close, hardly ever apart. This Court cannot precisely determine what factors the jury used to come to their decision, but these amounts, while large, are reasonable compensation for children who have lost the company of their parents, and the comfort of their close-knit family, for the rest of their lives. Also, it should be kept in mind that each parent was a separate and discrete loss to each child.

Appellants do not challenge the mental anguish and loss of companionship and society damages to the remaining plaintiffs as excessive, therefore, we will only address the factual sufficiency of the evidence to support the awards. The mental anguish and loss of companionship and society damages for the remaining plaintiffs, Consuelo DeCruz, Jose and Josefina Gutierrez, and Liroy Gutierrez, are also supported by sufficient evidence.

Consuelo DeCruz testified regarding the death of her daughter, Maria Gutierrez. When Maria and Gregorio moved to Texas, Consuelo came with them. Consuelo later returned to live permanently in Mexico, but stayed at Maria and Gregorio's home when she came to visit Maria and other family members in the United States. Maria confided in her mother in "all of her things," because she trusted her mother as a friend. Consuelo acknowledged that "there was something—something just between the two of us [she and Maria]," and Jaime Cruz, Maria's brother portrayed Maria as being extremely close to her mother, like an only daughter, even though she was one of nine children. Consuelo testified that she has spent the last four years remembering Maria, and "crying out for her," and has not forgotten any memories she has of her daughter.

Jose Gutierrez testified as to he and his wife, Josefina's, experiences since the death of their son, Gregorio Gutierrez. He testified that his son Gregorio was "[a] model. He was a good man." He said that Gregorio was the next best thing for him, besides his wife. Josefina Gutierrez became very ill when she was notified of the deaths. Jose and Josefina both have missed Gregorio, Maria, and Gregorio Jr. very much. Maria and Gregorio visited their parents often, took their children on family vacations to see them, and both were loved and will be missed very much by their parents. All the parents remarked on the shock and grief of one of their children dying before them.

Liroy Gutierrez was awarded $15,000 in mental anguish damages only for the loss of his father. Liroy knew Gregorio was his father, but, despite attempts to contact his father, and meet him, he never had the chance to actually know Gregorio. He tes-

tified, that at age nineteen, he traveled to the United States to try to find his father. He said he misses his father because he "always needed him and ... will always need him." He also testified that he feels "very bad because [he] lost all hope of knowing [his father]." Liroy, Consuelo DeCruz, and Jose and Josefina Gutierrez, as parents and a child of the victims, are naturally feeling grief over the loss of their loved ones that rises to the level sufficient to support their awards for mental anguish.

### Punitive Damages and Gross Negligence

■ The Appellants also attack the award of punitive damages, claiming that the evidence was legally and factually insufficient to support the award. We agree and will reverse the award of punitive damages. The jury found that Santa Fe was grossly negligent and awarded punitive damages of $44 million in this case.

■ Gross negligence includes two elements: (1) viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex.1998), *citing Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *See Universal Servs. Co., Inc. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995); *Moriel*, 879 S.W.2d at 22–23. Under the first element, "extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *See Ung*, 904 S.W.2d at 641; *Moriel*, 879 S.W.2d at 22. Under the second element, actual awareness means that the defendant

knew about the peril, but its acts or omissions demonstrated that it did not care. *See Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex.1993). Circumstantial evidence is sufficient to prove either element of gross negligence. *See Moriel*, 879 S.W.2d at 22–23; *Wal–Mart Stores*, 868 S.W.2d at 327.

■ In evaluating legal sufficiency, we determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See Moriel*, 879 S.W.2d at 25, *citing* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 522, 523 (1991). A factual sufficiency review must be conducted in light of the five factors from *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). These factors are: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *See also Ellis County State Bank v. Keever*, 936 S.W.2d 683, 686 (Tex.App.— Dallas 1996, no writ).

■ The objective element of gross negligence is viewed from the actor's standpoint. Here, the actors are Santa Fe and its employees, Engineer Guerrero and Conductor Baker. The evidence from the actor's standpoint shows that the whistle may or may not have been blown before the crossing in this case. The engineer testified that he properly blew the whistle all the way through the crossing, but the conductor testified that he was not aware of it until he saw the Gutierrezes' car on the tracks. The evidence also shows that the train crew more likely than not failed to keep a proper lookout. Although Guerrero testified on the stand that he saw the Gutierrezes' car on the highway, this contradicts his deposition testimony and the report filed immediately after the acci-

dent. The engineer and conductor claimed they put on the brakes very close to the time of impact, or at impact, and this is supported by testimony that the air brakes take several seconds to begin to stop the entire train. That is why the train would not make any sound until several seconds after the impact. There was also uncontroverted evidence that the train crew safely passed through the previous crossing less than a minute before the crash.

At trial, plaintiffs also introduced evidence that this crossing was extra-hazardous. There was testimony that in the mornings during the time of the year Gregorio was at the crossing, the sun blinded drivers. There was also testimony that the crossing had an extreme grade, out of line with industry standards, that was "complex." One expert testified there was background "clutter" that could disguise a train. Also, with a meat-packing plant and a truck-washing facility on the land opposite the highway over the tracks, there was heavy traffic at all times of the day and night at this crossing.

The subjective element of gross negligence focuses on the actor's awareness and attitude. "What lifts *ordinary* negligence into *gross* negligence is the mental attitude of the defendant." [Emphasis added]. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981). Gross negligence is also defined by what it is not. It is not merely momentary thoughtlessness, inadvertence, or error in judgment. *See Moriel*, 879 S.W.2d at 24. In this case, evidence does not exist, regarding blowing the whistle, to show that the train crew was consciously indifferent to persons who might be crossing the track where the accident occurred. The engineer testified he did blow it, and the conductor testified it was being blown at least several seconds before impact. Even assuming the jury disbelieved this testimony, which is exactly what seems to have happened, given their verdict, a failure to blow the whistle, by itself, does not rise to the level of conscious indifference. The "ear"

witnesses testified that they did not hear the whistle, but that does not mean that the engineer consciously decided not to blow it. The evidence is similar on the issues of proper lookout and failure to apply the brakes. There exists evidence that the train crew was not operating in accordance with the law, and rules and regulations, but not that they were deliberately ignoring the law and rules and regulations.

Some evidence does exist, however, that indicates that the railroad should have been aware of the extra-hazardous nature of the crossing. Teddy King, Gregorio's employer and owner of the truck-wash, testified that he received a call from Santa Fe *before* the accident concerning a truck of his that had a close call with a train at the same crossing. He told them that cross-arms needed to be erected.

This evidence is legally sufficient to support the jury's award of punitive damages. We will now turn to the factual sufficiency of the evidence, using the *Kraus* factors.

"The nature of the wrong refers to the nature of injury or harm caused by the defendant's actions." *Keever*, 936 S.W.2d at 686. The nature of the wrong here is grave. The negligence of the railroad's employees caused the death of half of a family, leaving three children orphaned. As evidenced by the analysis of compensatory damages, all family members were devastated by the deaths of Maria, Gregorio, and Gregorio Jr. The surviving children are still incredibly grief-stricken, even four years after the accident, and their lifestyle has been radically altered.

The second and third *Kraus* factors are the character of the conduct and the degree of culpability of the wrongdoer. These refer to the evidence of the state of mind of Santa Fe and its employees, the degree of conscious indifference, and any malice in their actions. *See Keever*, 936 S.W.2d at 686. Although the jury found that Santa Fe was grossly negligent, noth-

ing in the record sustains this finding, therefore, it is against the great weight and preponderance of the evidence. Although the jury may have determined that the whistle was not blown, nothing in the record indicates that this was more than an oversight on the part of the train crew. Appellees cannot point to any evidence that supports a finding that the crew intentionally ignored this crossing or that the crew routinely neglected to blow the whistle and Santa Fe was aware of it. Even in light of the evidence favoring the jury's verdict, (that the whistle was not blown, that the crew did not see the Gutierrez car until seconds before the crash, and that braking was not initiated until after impact), this does not demonstrate that the crew was consciously indifferent or grossly negligent, only that they were performing their duties very poorly. There also exists no evidence to support that the railroad management knew that this crew was particularly reckless in performing its duties.

Additionally, the evidence is factually insufficient to support the award of punitive damages for gross negligence for maintaining an extra-hazardous crossing. The only evidence that Santa Fe knew this crossing was extra-hazardous was Mr. King's phone conversation with "someone" who represented the railroad. Mr. King could not pinpoint the exact date of this conversation and did not obtain the name of the person to whom he was speaking. Additionally, all he claims he told the representative was that it was a "dangerous intersection and there was a lot of traffic and they need to put up arms so that nobody got killed there." Mr. King did not relay that the crossing had a steep grade, a complicated approach, clutter in the background that made it difficult to pick out an oncoming train, tall weeds, or that the sun frequently blinded drivers on summer mornings. Without probative evidence that Santa Fe had awareness of these factors, we cannot find gross negligence on their part. Furthermore, the numerous photographs in the exhibits in this case give no indication that Santa Fe would know on sight that this crossing was particularly dangerous. The crossing does not appear to be particularly steep or complicated to approach and the tracks are clear of any large objects for about one mile before the crossing. Thus, there is factually insufficient evidence to sustain the award of punitive damages.

The fourth *Kraus* factor deals with the situation and sensibilities of the parties. It refers to evidence of remorse, remedial measures, and ability to pay punitive damages. *See Keever*, 936 S.W.2d at 688. The train crew expressed sympathy for the victims and the railroad has acknowledged that the accident was a tragedy. At this time, the crossing remains the same. Of course, Santa Fe has the ability to pay punitive damages. The jury heard about the net worth of the company at the punitive damages phase of the trial. However, there must be factually sufficient evidence to support the award, and as we have already concluded that the conduct of the railroad or its employees did not rise to the subjective standard required by *Moriel*, the ability to pay is moot.

The public sense of justice and propriety is the fifth *Kraus* factor. Certainly, the railroad should pay for the damages it caused due to negligence, but its conduct in this case does not warrant punishment. Thus, propriety and the public sense of justice are in its favor and the award of punitive damages will be reversed.[7]

We uphold the jury's finding of negligence and the compensatory damages for pecuniary loss, loss of companionship and society, and mental anguish as to all Appellees. We reverse the jury's finding of

---

7. Because we find that the evidence is factually insufficient to support the award of punitive damages, we decline to consider whether Engineer Guerrero, Conductor Baker, or both are vice-principals of the corporation for the purposes of finding gross negligence. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921–22 (Tex.1998).

gross negligence and render that Appellees take no punitive damages.